Filed 4/20/15  In re J.M. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ARLENE C. et al.,<br><br>Defendants and Appellants. | B257746<br>(Los Angeles County<br>Super. Ct. No. CK94624) |

APPEAL from an order of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Arlene C.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant Jesus M.

Office of the County Counsel, Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellants Arlene C. (Mother) and Jesus M. (Father) appeal the juvenile court's order terminating parental rights. Appellants contend the court should have applied the exception to termination under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2012, Father brought eight-month old J.J. to the emergency room, suffering from fever, dehydration, lethargy and infected lesions in his mouth. Hospital personnel concluded the lesions were caused by his having been forced to drink a burning hot liquid. During J.J.'s hospitalization, the caseworker for the Department of Children and Family Services (DCFS) learned that a few months earlier, Father had hit the baby hard enough to leave bruises. Mother, too, had been the victim of Father's domestic violence, and the grandparents had cared for the baby without Mother's or Father's participation for several months of his life.[2] The caseworker also received information that Father was abusing

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    The maternal grandparents were also caring for J.J.'s older half-brother, R.G., and had been doing so since 2006. The grandparents obtained guardianship of R.G. after Mother and R.G.'s father had been referred to DCFS due to abuse of drugs and domestic violence. R.G. reported that Father had struck him in the past. In 2007, another half-sibling of J.J.'s, Father's child with another woman, had died at the age of four months while in Father's care. The cause of death was determined to be sudden infant death syndrome, but the coroner's office found that "'imposed' suffocation" could not be ruled out.

2

methamphetamine, had obtained a medical marijuana card, and was being treated for a psychiatric disorder but not taking his prescribed medication. Mother was on probation for possession of a controlled substance. She admitted using methamphetamine in the recent past. She also admitted having seen the bruising on J.J.

A short time after his detention, J.J. was placed in the home of his maternal aunt. The aunt reported that J.J. already had spent a significant amount of time with her family, that her children were very attached to him, and that she had begun to consider J.J. her son prior to DCFS's involvement. The caseworker noted that J.J. did not appear to be bonded to either parent.[3]

At the September 2012 jurisdictional hearing, the court found jurisdiction appropriate under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (j) (abuse of sibling) based on the following allegations: (1) J.J. suffered an inflicted burn and nonaccidental trauma which would not have occurred except as the result of deliberate, unreasonable and neglectful acts by the parents; (2) Father physically abused J.J. by repeatedly striking his buttocks, resulting in bruises to his back and thighs; (3) Father physically abused J.J.'s half-brother, R.G., by striking his arms and shoulders; (4) Mother failed to protect J.J. and R.G. from Father's physical abuse; (5) Father and Mother had a history of engaging in violent altercations in the presence of J.J.; (6) Father and Mother neglected J.J. by failing to obtain timely medical treatment for his burned mouth; (7) Father had a history of substance abuse and was a current user of

---

[3]    Mother initially proposed ceding parental rights to the grandparents and stated that her mother had essentially raised J.J. prior to DCFS's involvement. Father admitted he had no relationship with J.J., as the boy had been with other caretakers for much of his life.

methamphetamine; and (8) Mother had a history of substance abuse, including methamphetamine.

In March 2013, the caseworker reported that Mother had failed to drug test on multiple occasions, and had not enrolled in a parenting program or individual counseling as required by the court-ordered reunification program. In addition, Mother was not visiting J.J. as often as the court allowed.[4] During this period, Father was not participating in his reunification program and had not visited the child at all. By order dated March 6, 2013, the court found: (a) that the parents had not consistently and regularly contacted and visited J.J.; (b) that they had not made significant progress in resolving the problems that led to his removal from their home or demonstrated an ability to complete the objectives of the reunification plan and provide for J.J.'s safety; and (c) that there was no substantial probability J.J. would be returned to the parents' custody within the next period of review. The court terminated reunification services and set a section 366.26 hearing.

In the June 2013 section 366.26 report, the caseworker reported that Mother's visitation continued to be inconsistent and infrequent. Father had a handful of visits during this period. J.J. did not appear to recognize him and did not interact well with him. In October 2013, the maternal aunt expressed the desire to adopt the boy. DCFS began adoptive planning, and the court ordered adoption as the permanent plan. In the December 2013 report, the caseworker described the relationship between J.J. and his prospective adoptive family as "strong, loving and characteristic of a parent-child relationship." All the members of the prospective

---

[4]    The court's original visitation order provided the parents monitored visitation three times a week. Mother scheduled visits twice a week, but was generally visiting once a week or less.

adoptive family "love[d] and adore[d]" J.J., and he called his aunt and uncle "[M]a" and "Da." The adoption home study was approved June 5, 2014.

The section 366.26 hearing took place over several days in June and July 2014.[5] The parents presented evidence concerning the services they had voluntarily completed in the period after the court terminated reunification services, the counseling they had undergone, and their generally positive interactions with J.J. during recent visits.[6] Father testified and denied that he had ever physically abused J.J. or assaulted Mother.[7] The parents' attorneys argued that they had established the parental bond exception to termination of parental rights. DCFS recommended that parental rights be terminated, contending that the parents had, at most, a casual relationship with J.J. and had never assumed parental roles. Counsel for J.J. joined DCFS's recommendation to terminate parental rights, arguing that any benefit of continuing visits with the parents was outweighed by the benefit of providing J.J. a permanent home through adoption.

The court found that the parents had not visited regularly, that they had never asked for their twice monthly visits to be increased, and that they had not

---

[5] In June 2014, appellants filed separate section 388 petitions, presenting evidence of having completed a parenting program and participating in other programs, including individual and joint counseling. The court denied the section 388 petitions at the July 2014 hearing at which it addressed termination of parental rights. Appellants do not challenge that ruling.

[6] In August 2013, after termination of reunification services, the court reduced parental visitation from three times a week to twice a month. The court observed that visitation had been sporadic, and stated it would consider changing the visitation order if the parents began visiting regularly. The parents did not begin consistent twice-monthly visits with J.J. until shortly before the section 366.26 hearing. During their visits, the parents played with J.J., changed his diaper, and fed him. J.J. generally enjoyed the visits, although on one occasion Father became angry at the caregivers and Mother, causing the boy to become anxious and upset.

[7] Mother did not testify.

bonded with J.J. past the point of becoming persons he liked and had fun with during visits. Finding J.J. to be adoptable, the court terminated parental rights. Both parents appealed.

## DISCUSSION

Section 366.26, subdivision (c)(1) requires the juvenile court to terminate parental rights and order the dependent child placed for adoption if it finds by clear and convincing evidence that the child is likely to be adopted, unless it finds "a compelling reason for determining that termination would be detrimental to the child" due to the existence of specified exceptional circumstances. (See § 366.26, subd. (c)(1)(B); *In re Scott B.* (2010) 188 Cal.App.4th 452, 469 ["[A]doption is the Legislature's first choice for a permanent plan for a dependent minor child who has not been returned to the custody of his or her parents and who is found by the dependency court to be adoptable."].) Section 366.26, subdivision (c)(1)(B)(i), provides an exception where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The burden is on the parent to demonstrate regular visitation, and that termination of parental rights to an adoptable child would be detrimental to the child. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) We review the juvenile court's section 366.26 findings for substantial evidence. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 553; *In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)[8]

---

[8] As pointed out in the briefs, some appellate courts have applied substantial evidence review to the issue whether a beneficial parental relationship exists and abuse of discretion review to whether termination would be detrimental to the child. (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503, 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.) On this record, we would affirm under either standard.

6

A parent's failure to maintain regular visitation and contact precludes a finding that the exception exists.  (§ 366.26, subd., (c)(1)(B)(i); *In re C.F.*, *supra*, 193 Cal.App.4th at p. 554.)  Moreover, even when a parent has maintained regular visitation and contact, the exception does not apply unless the strength and quality of the natural parent/child relationship outweighs the security and the sense of belonging a new family would confer.  (*In re C.F.*, *supra*, at p. 555.)  "A parent must show more than frequent or loving contact or pleasant visits."  (*Id.* at p. 555.)  Only if "severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed" is the preference for adoption overcome.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Here, the court's finding that the parents had not visited regularly was amply supported by the record.  Father failed to visit at all for a lengthy period and visited sporadically thereafter; Mother visited significantly less often than the court allowed.  The finding of irregular and inconsistent visitation, standing alone, supports the termination order.  Moreover, the evidence was overwhelming that neither Mother nor Father had a significant parental bond with J.J.  The child had spent so little time with the parents prior to DCFS's involvement that at the time of the detention, he barely recognized them and had no discernable relationship with either parent.  At the end of the two years following J.J.'s detention, Mother and Father had developed a friendly and pleasant relationship with the boy and made efforts to meet his immediate needs during their two hours of monthly visitation.  It is clear, however, that the boy's only parent/child bond was with his adoptive parents who had cared for him nearly all his life, who had integrated him into their family, and whom he regarded as his "[M]a and Da."  No evidence was presented that J.J. had ever been greatly attached to Mother or Father, that he missed them when he was outside their presence, or that he was unhappy or suffering

7

emotionally or developmentally in his placement with the maternal aunt's family. Thus, Mother and Father failed to establish that the boy would be "greatly harmed" by the loss of the relationship that arose from their irregular visitations.  (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)


## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.