[No. D052202. Fourth Dist., Div. One. June 26, 2008.]

In re S.B., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
MICHAEL B., Defendant and Appellant.

COUNSEL

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, John E. Philips and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

OPINION

**BENKE, Acting P. J.**—Michael B. appeals an order terminating his parental rights to his daughter, S.B., under Welfare and Institutions Code[1] section 366.26. He contends the court erred when it did not apply the exception to termination for parents who have continuing beneficial relationships with their dependent children. (Former § 366.26, subd. (c)(1)(A).)[2] Michael further contends the court did not comply with the notice provisions of the Indian Child Welfare Act of 1978 (ICWA). (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.)

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Effective January 1, 2008, the Legislature amended and renumbered section 366.26, subdivision (c)(1). (Stats. 2006, ch. 838, § 52.) Former section 366.26, subdivision (c)(1)(A), is now section 366.26, subdivision (c)(1)(B)(i).

We conclude Michael had a continuing beneficial relationship with his daughter within the meaning of the statutory exception to termination of parental rights. We also agree there was noncompliance with ICWA. Accordingly, we reverse and remand with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Michael and Stephanie J.[3] are the parents of S.B., born October 2002. Michael was S.B.'s primary caregiver; the record indicates Stephanie was in and out of S.B.'s life. On November 15, 2005, Michael and Stephanie were arrested on drug-related charges, including being under the influence of methamphetamine. Michael admitted he used methamphetamine "on and off" for 30 years.

The San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivision (b), alleging the parents could not provide regular care to S.B. because of substance abuse. On January 9, 2006, the court sustained the petition, removed S.B. from parental custody and placed her with her maternal grandparents. The court ordered a plan of family reunification services for each parent.

At the outset of the proceedings, Michael informed the social worker he was or may be a member of or eligible for membership in the "Blackfoot Lakota Sioux." (See generally ICWA, 25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224 et seq.; Cal. Rules of Court,[4] rule 5.664.) The Agency reported it notified the Blackfeet tribe and all Sioux tribes of the dependency proceedings (Sioux notices). The Agency filed Judicial Council former form JV-135[5] and the tribes' responses with the court on February 7, 2006. The notice to the Oglala Sioux was returned unclaimed.[6] On February 22 the court found notice was appropriate and ICWA did not apply.

At the contested 12-month review hearing on February 22, 2007, the Agency reported Michael "complied with every aspect of his case plan," including maintaining his sobriety and consistently visiting S.B. However, social worker Bernadette Brown opined Michael's physical and emotional health prevented him from reunifying with S.B.

---

[3] Stephanie does not appeal.

[4] All rule references are to the California Rules of Court.

[5] Form JV-135 was entitled "NOTICE OF INVOLUNTARY CHILD CUSTODY PROCEEDINGS FOR AN INDIAN CHILD." The use of form JV-135 was mandated by the Judicial Council for notice to Indian tribes of proceedings involving the custody of Indian children.

[6] Notice to the Oglala Sioux was sent to an incorrect address.

Michael served in Vietnam on a helicopter gunship from 1967 to 1969. He experienced recurrent bouts of anger and aggression and was diagnosed with combat-related posttraumatic stress disorder. Michael's treatment included psychotropic medications, individual therapy and group therapy. Michael's physical health was also poor. He had heart and stomach problems and acute degenerative osteoarthritis that caused severe neck and back pain. Michael acknowledged his current health problems impeded his ability to care for S.B. full time.

Brown reported Michael visited S.B. three days a week. The visits were supervised. S.B. became upset when the visits ended and wanted to leave with Michael. Brown noted Michael "demonstrates empathy and the ability to put himself in his daughter's place to recognize her needs." Brown stated: "It pains the Agency not to be able to reunify [Michael] and his daughter [S.B.] because of his consistent efforts to alleviate and or mitigate the reasons his family was brought to the attention of the court."

At some point in time, the Agency learned Michael's maternal grandfather was Mescalero Apache and a grandmother was Mexican Yaqui.[7] The Agency obtained additional information about Michael's father and paternal grandfather after it sent the Sioux notices. This information included Michael's father's name and the former addresses, birthplaces, birth dates and the dates and places of death of both his father and grandfather. On June 20 and August 6, 2007, the court continued the section 366.26 hearing to allow the Agency to resolve the pending ICWA issues.

In late June 2007 the Agency reported form JV-135 "was corrected and re-sent on May 10, 2007" (revised JV-135). The Agency sent the revised JV-135 to the Bureau of Indian Affairs (BIA), the Pascua Yaqui tribe, the Blackfeet tribe, Michael, and Stephanie. The Agency attached the notices and the responses received from the tribes to its addendum report. Notice to Stephanie was returned, marked "not deliverable as addressed." The Agency did not notice the Mescalero Apache tribe.

In August 2007 the Agency reported all tribes were appropriately noticed and all ICWA response letters were received. The responses indicated S.B. was not eligible for membership in any of the noticed tribes. In October the Agency informed the court it noticed the Mescalero Apache tribe on August 7, and the tribe responded S.B. was not eligible for enrollment. The Agency recommended the court find ICWA did not apply.

---

[7] We cannot determine from the record whether the grandmother was Michael's paternal or maternal grandmother.

The section 366.26 hearing was held on December 4, 2007. Michael contested the Agency's recommendations to terminate parental rights.[8] The court admitted into evidence the Agency's court reports and addendums prepared for the section 366.26 hearing and a bonding study conducted by Dr. Robert Kelin dated July 26, 2007. The court heard testimony from social worker David Smith and Dr. Kelin.

Social worker Stefani Castro prepared the initial section 366.26 report and addendum report dated August 6, 2007. Castro observed four visits between Michael and S.B. She stated S.B. had a consistent and positive relationship with Michael, who visited her two to three times each week. During visits, however, S.B. looked to her grandmother for security, safety, guidance and parenting. Castro opined that for S.B., the benefits of adoption outweighed the benefits of maintaining the parent-child relationship. S.B.'s primary attachment was to her grandparents. They provided day-to-day care. The best outcome would allow S.B. to continue her relationships with her parents through supervised visitation. However, were visitation not to occur, the loss of the parent-child relationship would not be a "huge detriment" to S.B.

The case was assigned to social worker David Smith before the section 366.26 hearing. Smith observed one visit between Michael and S.B. Smith testified Michael was very involved in the visit but S.B.'s grandmother assumed the more parental role. Smith acknowledged there would be some detriment to S.B. were parental rights terminated. The Agency's recommendation to terminate parental rights was based in part on the grandparents' intent to continue Michael's visits with S.B. In making his recommendation, Smith also considered S.B.'s secure, strong attachment with her grandmother. Smith opined that any detriment to S.B. would be outweighed by the benefit she would gain from adoption.

Dr. Kelin conducted a bonding study between Michael and S.B. Dr. Kelin described the bond between them as "fairly strong" or "moderate." He used the terms interchangeably. During the study, S.B. sat in Michael's lap, played games and colored. Michael was responsive to her requests. In the middle of coloring, S.B. said to Michael, "I love you," and he responded in kind. S.B. whispered and joked with Michael and then spontaneously said, "I wish I lived with you and Mommy and Nana."

Dr. Kelin testified the degree of harm a child might experience from the loss of a parental relationship was hard to predict. In general, if a child had a stable relationship with another person, it would reduce the risk of harm from

---

[8] Stephanie did not appear at the section 366.26 hearing. She informed the court through counsel she supported Michael's position.

severing another relationship. Dr. Kelin believed Michael's relationship with S.B. vacillated between parental and peer-like. S.B. listened and responded to Michael, but at times she was directive and bossy. Dr. Kelin concluded that, because the bond between Michael and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship.

The court took judicial notice of its prior findings and orders. It found Michael maintained frequent and loving contact with S.B. and they shared an emotionally significant relationship; however, there was no evidence to suggest Michael's relationship with S.B. was parental in nature or that it would be greatly detrimental to S.B. to terminate her relationship with her father. The court found ICWA did not apply and adoption was in S.B.'s best interests. The court terminated parental rights.

## DISCUSSION

### I

### *The Continuing Beneficial Relationship Exception to Termination of Parental Rights*

#### A

Michael contends the court erred when it terminated his parental rights. He argues he met his burden of proof to show he regularly visited S.B. and had a beneficial parental relationship with her that outweighed any prospective adoption. Michael asserts the court erred when it used the grandparents' willingness to continue his visitation with S.B. as a factor in determining whether to terminate parental rights. Michael also posits S.B.'s strong bond with her grandmother was not relevant in evaluating the nature and strength of the parent-child relationship.

The Agency maintains Michael does not meet his burden on appeal to show the court's findings are not supported by substantial evidence. The Agency contends Michael did not have a parental relationship with S.B. because she did not look to him for day-to-day nurturing, stability, encouragement and support. The Agency also argues S.B. did not have a primary attachment to Michael and any evidence to show she would be harmed by termination of parental rights was merely speculative.

At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. (*In re Taya C.*

(1991) 2 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 810].) If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888 [55 Cal.Rptr.2d 396, 919 P.2d 1329]; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808–809 [92 Cal.Rptr.2d 20].)

■ Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343–1345 [63 Cal.Rptr.2d 562]; but see § 366.26, subd. (c)(1)(A), eff. Jan. 1, 2008.) Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535] (*Autumn H.*) we interpreted the " 'benefit from continuing the . . . relationship' " to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." We further explained "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) "*Autumn H.* has been widely followed by the Courts of Appeal . . . ." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347 [93 Cal.Rptr.2d 644].)

In describing a parent-child relationship that may confer more than incidental benefit to a child, we noted: "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (See Goldstein et al., Beyond the Best Interests of the Child (1973) p. 17.) The relationship arises from day-to-day interaction, companionship and shared experiences. (*Id.* at p. 19.) The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d

217].) If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c). (*Autumn H., supra*, 27 Cal.App.4th at p. 576.)

B

Here, the court found Michael had frequent and loving visits with S.B. and had "an emotionally significant relationship" with her. The court also found there was no evidence to suggest Michael's relationship with S.B. was parental in nature or that it would be greatly detrimental to S.B. to terminate the relationship.

The parties agree Michael maintained regular, consistent and appropriate visits with S.B. throughout the dependency proceedings. The court's finding Michael and S.B. had an emotionally significant relationship is amply supported by the record. However, there is no evidence to support the court's finding Michael did not have some type of parental relationship with S.B.

Michael was S.B.'s primary caregiver for three years. In 2004 a social worker observed him parenting S.B. in a patient and loving manner. When S.B. was removed from his care, Michael immediately recognized that his drug use was untenable, started services, maintained his sobriety, sought medical and psychological services, and maintained consistent and regular visitation with S.B. He complied with "every aspect" of his case plan.

For the first year after she was removed from parental custody, S.B. continued to display a strong attachment to Michael. She was unhappy when visits ended and tried to leave with Michael when the visits were over. Michael was sensitive to S.B.'s needs. Social worker Brown noted, "[Michael] consistently puts his daughter[']s needs and safety before his own." S.B. responded to Michael's attention. During one visit, S.B. "sat on [Michael's] lap . . . [and] proudly showed off the pink tennis shoes he had bought her." The record clearly establishes S.B. initiated physical contact with Michael. Dr. Kelin observed that S.B. "ran into [Michael's] arms, again getting her father to pick her up." Michael and S.B. shared an affectionate relationship. S.B. "nestle[d] up to [Michael's] neck" and "whispered and joked with him." The record also shows S.B. loved Michael and wanted their relationship to continue. S.B. whispered to her father, "I love you." As Michael started to leave, S.B. stated, "I'll miss you," and then she gave him another hug. S.B. spontaneously said, "I wish I lived with you and Mommy and Nana."

According to the 1973 work of psychoanalytic theory central to *Autumn H.*, a child could not develop such a significant attachment to a

parent without the parent's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (See Goldstein et al., Beyond the Best Interests of the Child, *supra*, pp. 6, 17 (Goldstein).) As we recognized in *Autumn H.*, this type of relationship typically arises from day-to-day interaction, companionship and shared experiences, *and may be continued or developed by consistent and regular visitation* after the child has been removed from parental custody. (*Autumn H., supra*, 27 Cal.App.4th at p. 575, citing Goldstein, at p. 19.) The record here fully supports the conclusion Michael continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care. (Cf. *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426] ["Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship."].)

This case is similar to *In re Amber M.* (2002) 103 Cal.App.4th 681, 690–691 [127 Cal.Rptr.2d 19] (*Amber M.*). In that case, we concluded the trial court erred when it terminated the parental rights of a mother who visited her children as often as she was allowed, acted in a loving, parental role when she was with the children, and did virtually everything asked of her to regain custody. (*Id.* at p. 690.) The children loved and missed their mother. Depending on the children's ages, they had either a strong primary bond or strong attachment to her. We also noted the social worker impermissibly considered the suitability of the grandparents' home in recommending termination of parental rights. (*Ibid.*)

We reject the Agency's position the continuing beneficial relationship exception does not apply unless the child has a "primary attachment" to the parent. (See, e.g., *Amber M., supra*, 103 Cal.App.4th at pp. 689–691.) *Autumn H.* does not narrowly define or specifically identify the type of relationship necessary to establish the exception. The exception may apply if the child has a "substantial, positive emotional attachment" to the parent. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) We do not believe it is reasonable to require the parent of a child removed from parental custody to prove the child has a "primary attachment" to the parent, or to show the parent and the child have maintained day-to-day contact. If that were the standard, the rule would swallow the exception. (Cf. *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 336 [42 Cal.Rptr.3d 47, 132 P.3d 249].)

We are also troubled by the argument that any detriment to S.B. from the loss of the parent-child relationship will eventually be ameliorated by time and S.B.'s strong relationship with her grandmother. When a child cannot be returned to the physical custody of a parent, we expect the child has developed or will develop a secure parental relationship with his or her

primary caregiver or prospective primary caregiver. We believe it is a self-evident proposition that at any one time a child may have more than one parent or person acting as a parent.[9] Here, S.B. derived comfort, affection, love, stimulation and guidance from her continued relationship with Michael. The fact that S.B. also had a strong, positive and significant relationship with her grandmother does not negate the harm S.B. would experience from the loss of her significant, positive, emotional relationship with her father.[10] Thus the proposition that S.B.'s loss may be healed by time and support, even if true, does not support a finding S.B. would not be greatly harmed by termination of parental rights. (§ 366.26, subd. (c)(1)(B); *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

■ The court recognized that S.B. would benefit from continuing her relationship with Michael and based its decision to terminate parental rights in part on the grandparents' willingness to allow Michael to continue to visit S.B. We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents. This situation is not, as the Agency contends, analogous to the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v), in which the court considers future sibling contact and visitation. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 254 [127 Cal.Rptr.2d 876].) Unlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights. (*In re Valerie A.* (2006) 139 Cal.App.4th 1519, 1524 [43 Cal.Rptr.3d 734]; *In re Miguel A.* (2007) 156 Cal.App.4th 389, 396 [67 Cal.Rptr.3d 307].)

■ Neither section 366.26, subdivision (c)(1)(B)(i), nor *Autumn H.* requires proof that the child has a "primary attachment" to a parent or that the noncustodial parent has maintained day-to-day contact with the child. (*Autumn H., supra,* 27 Cal.App.4th at p. 575; *In re Casey D., supra,* 70 Cal.App.4th at p. 51.) Here, Michael maintained a parental relationship with S.B. through consistent contact and visitation. His devotion to S.B. was constant, as evinced by his full compliance with his case plan and continued efforts to regain his physical and psychological health. The record shows S.B.

---

[9] In a later work, the authors of Beyond the Best Interests of the Child noted: " 'In order to develop—intellectually, emotionally, socially, and morally—a child requires participation in progressively more complex reciprocal activity, on a regular basis over an extended period in the child's life, with *one or more persons* with whom the child develops a strong, mutual, irrational, emotional attachment and who is committed to the child's well-being and development, preferably for life.' " (Goldstein et al., The Best Interests of the Child: The Least Detrimental Alternative (1996) p. 88, fn. †, quoting Bronfenbrenner, italics added.)

[10] Effective January 1, 2008, the Legislature amended section 366.26, subdivision (c)(1). If certain conditions apply, section 366.26, subdivision (c)(1)(A), now allows the court to select guardianship with a relative as the child's permanency plan without requiring a finding that termination of parental rights would be detrimental to the child. (See § 366.26, subd. (c)(1), (1)(A), eff. Jan. 1, 2008.)

loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with Michael. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575–576.) We conclude the court erred when it found the continuing beneficial relationship exception did not apply and terminated parental rights. (§ 366.26, subd. (c)(1)(B)(i).)

II

*ICWA*

A

Michael contends the court erred when it determined ICWA did not apply. He asserts the Agency did not (1) provide proper verification to the court that it notified the BIA of the dependency proceedings (the BIA error); (2) properly notice the Oglala Sioux tribe; (3) send the revised JV-135 to the Sioux tribes; (4) notice all Apache tribes; and (5) notice Stephanie as required under ICWA. (See 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2.)

The Agency acknowledges error with respect to notice to the BIA, the Oglala Sioux, the Sioux tribes and Stephanie. The Agency concedes the notices sent to the Sioux tribes contained insufficient information to constitute proper notice and the matter should be remanded for the limited purpose of complying with the notice provisions of ICWA. As to the other claimed errors, the Agency asserts the BIA error was rendered harmless when the Agency submitted proof to the court that it sent the revised JV-135 to the BIA. It also contends the error as to Stephanie was harmless because she did not claim any Native American Indian heritage. Finally, the Agency disagrees with Michael's contention the Agency is required to notice all Apache tribes in addition to the Mescalero Apache tribe, which was identified as Michael's maternal grandfather's tribe. Minor's counsel concurs with the Agency's position.

We agree with the parties the Agency must notice the Sioux tribes with any additional information the Agency has obtained about the family's Native American Indian heritage and history. (*In re Francisco W.* (2006) 139 Cal.App.4th 695, 703 [43 Cal.Rptr.3d 171]; *In re Louis S.* (2004) 117 Cal.App.4th 622, 630–631 [12 Cal.Rptr.3d 110] (*Louis S.*).) We conclude the BIA error was cured when the Agency sent the revised JV-135 to the BIA and filed proper verification with the court. (Cf. *Louis S., supra,* 117 Cal.App.4th at p. 631.) We are not persuaded by Michael's argument that the lack of actual ICWA notice to Stephanie requires reversal of the order terminating

parental rights. The record shows Stephanie had actual notice of the section 366.26 hearing, and neither she nor Michael objected to the section 366.26 hearing on the ground Stephanie did not receive notice as required under title 25 United States Code section 1912(a) and section 224.2.[11] Thus the issue as to Stephanie is forfeited on appeal. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222 [33 Cal.Rptr.3d 337].)

The only unresolved ICWA issue here is whether the Agency has an obligation under federal and/or state law to notice all federally recognized Apache tribes, in addition to the Mescalero Apache tribe, which was identified as the tribe of Michael's maternal grandfather. We now discuss the Agency's obligation to notice the Apache tribes other than the Mescalero Apache tribe.

## B

■ Notice is a "key component of the congressional goal to protect and preserve Indian tribes and Indian families." (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421 [285 Cal.Rptr. 507].) Notice requirements are strictly construed. (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 470 [99 Cal.Rptr.2d 688].) The Agency must provide notice to all tribes of which the child may be a member or eligible for membership. (§ 224.2, subd. (a)(3); *Louis S., supra*, 117 Cal.App.4th at pp. 632–633.) Notice to the tribe provides it the opportunity to assert its rights. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 174 [6 Cal.Rptr.3d 205].) If the identity of the tribe cannot be determined, notice is to be served on the BIA. (25 U.S.C. § 1912(a); see also Welf. & Inst. Code, § 224.2, subd. (a)(4).)

Here, the Agency received a response from the BIA on August 16, 2007. Iris Peterson, supervisory social worker with the BIA, the Mescalero Indian Agency, informed the Agency the BIA was not an agent of notice for the Mescalero Apache tribe and the Agency's request was being forwarded to the tribe's designated agent of notice. Peterson advised the Agency to obtain a copy of the agents of notice for each tribe in the nation. If the Agency did not know the tribe but suspected S.B. was an Indian child, Peterson stated it was her understanding the Agency "must make every attempt to identify the Tribe and then determine whether the child would be eligible for membership." Peterson noted there are more than 500 federally recognized tribes in the United States. She invited the Agency to contact her with questions.

---

[11] We presume that on remand the Agency will provide notice to Michael and Stephanie as required under title 25 United States Code section 1912(a) and section 224.2, if it has not already done so.

This case is similar to *Louis S.*, in which this court stated the social worker should have determined whether members of the Chiricahua tribe, a non-federally-recognized Apache tribe, may be members of or be eligible for membership in another Apache tribe and to provide notice to the tribe or tribes that had absorbed the Chiricahua tribe. (*Louis S., supra,* 117 Cal.App.4th at p. 632.) Further, if the social worker could not determine which tribes absorbed the Chiricahua tribe, the social worker should give notice to the BIA and any tribes that had absorbed individual members of the Chiricahua tribe. (*Id.* at p. 633; 25 U.S.C. § 1912(a).)

Although this case involves the Mescalero Apache tribe and not the Chiricahua tribe, the record contains no information that would allow us to conclude a dependent child whose paternal grandmother's heritage was Mescalero Apache on the grandmother's father's side (Arizona, circa 1895) was not a member of or eligible for membership in any other Apache tribe. The Agency should contact the BIA for assistance in determining whether in view of the family's heritage S.B. may be a member of or eligible for membership in any tribe other than the Mescalero Apache. (*Louis S., supra,* 117 Cal.App.4th at pp. 632–633.) This is consistent with the recommendations the Agency received from the BIA on August 16, 2007. We do not suggest the Agency must conduct extensive research; a telephone conversation with a person at the BIA who is familiar with the Apache tribes should be sufficient. If the Agency cannot determine the identity of the tribe or tribes, then "[s]erving the BIA eliminates the need to serve the remaining Apache Tribes." (*Id.* at p. 633; see 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a)(4).)

## DISPOSITION

The order terminating parental rights is reversed and the matter is remanded to the juvenile court with directions that it require the Agency to consult with the BIA concerning the child's Apache heritage, provide proper notice to any prospective tribes and to the BIA, and file with the court the notices, return receipts and any responses. If an Indian tribe determines the child is an Indian child under ICWA, the court shall conduct the jurisdiction, disposition and all subsequent hearings in accordance with ICWA.

If, on the other hand, the court determines ICWA notice was proper and no Indian tribe seeks to intervene or otherwise indicates the child is an Indian child as defined by ICWA, the court shall hold a section 366.26 hearing to select and implement a new permanency plan for the child. Nothing in this opinion should be construed to prejudice the court's authority to consider developments during the pendency of this appeal and to select adoption as the

child's permanency plan on a finding of changed circumstances. (Cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 535 [65 Cal.Rptr.2d 495]; see also § 366.3, subds. (c), (g).)

McDonald, J., and McIntyre, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 1, 2008, S165769. Kennard, J., did not participate therein.