Filed 8/27/15  In re Alberto F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ALBERTO F. et al., Persons Coming Under the Juvenile Court Law. | D067838 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Appellant, | (Super. Ct. No. J515656D-E) |
| v. | |
| D. E., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer Stone, Deputy County Counsel, for Plaintiff and Respondent.

D. E. appeals orders terminating parental rights under Welfare and Institutions Code section 366.26.[1] She contends the juvenile court erred in finding the beneficial parent/child relationship did not apply and terminating parental rights. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Alberto F., now 13 years old, and D.V., now nine years old, are the children of D. E. and Ruben F.[2] Alberto was a juvenile court dependent from 2005 until 2010 because of domestic violence and D.'s substance abuse problems. D.V. was a juvenile court dependent from her birth in 2006 until 2010.[3] Alberto was placed with his maternal grandmother (Grandmother) for approximately three years. He was returned to his mother's care in 2008. D.V. was in foster care from birth to 10 months, when she was returned to D.'s care.

In August 2011, the San Diego County Health and Human Services Agency (Agency) filed petitions alleging the children, then ages nine and five years, were at substantial risk of serious harm because of hazardous conditions in the home and D.'s substance abuse problems. (§ 300, subd. (b).) D. was arrested and incarcerated on charges of child endangerment. Ruben's whereabouts were unknown. The juvenile court

---

[1]  Unless otherwise indicated, further statutory references are to the Welfare and Institutions Code.

[2]  Ruben does not appeal.

[3]  The history of the children's first dependency proceedings is detailed in our nonpublished opinions *In re Tatiana V.* (Mar. 13, 2008, D051007, D051276); *In re Tatiana V.* (June 2, 2009, D053584); *In re T.V.* (Oct. 5, 2009, D055144); and *In re Tatiana V.* (Mar. 16, 2011, D057624). The children's three older half siblings were also juvenile court dependents.

sustained the section 300 petitions, placed Alberto and D.V. with Grandmother, and ordered family reunification services for D.[4]

During the first six months of the dependency proceedings, a criminal protective order barred D. from having any contact with the children. D. was served with the order in August 2011. She visited the children in violation of the restraining order until October, when the Agency learned of the order. She did not participate in substance abuse treatment. D. was arrested in April 2012 for not reporting to probation. She did not participate in services.

In May 2012, the criminal protective order was amended to allow D. to have contact with Alberto and D.V. D. was released from jail in late June. She telephoned the children twice and visited them twice from May through mid-September. Grandmother asked the social worker to tell D. the children really wanted to hear from her. The social worker submitted a referral to a visitation center but the center could not reach D. D. started telephoning the children in mid-September.

In January 2013, the social worker reported that D. was regularly visiting the children for an hour a week. The children were happy to see her. They told the social worker they loved their mother and loved being with her. D. did not show up for scheduled visits with Alberto and D.V. on Christmas Day or New Year's Day.

In February 2013, D. began visiting the children once a week for an hour and a half. The Agency approved unsupervised visitation. On March 1, D. tested positive for

---

4    A brief history of the children's second dependency cases is described in our nonpublished opinion *In re Alberto F*. (Feb. 4, 2015, D065597).

3

amphetamine and methamphetamine and supervision requirements were reinstated. The Agency also learned D. had tested positive for drugs in November 2012.

At the 18-month review hearing in April 2013, the juvenile court terminated reunification services and set a section 366.26 hearing. In August, the Agency asked the juvenile court to continue the section 366.26 hearing for 180 days to allow it to identify an appropriate permanent placement for Alberto, D.V., and an older half sister.

The social worker reported that Alberto had difficulty following direction. He was disrespectful of authority, had tantrums, and was angry and disruptive at school. Alberto resisted therapy. He was acting out more and his attitude was getting worse. In September, Grandmother asked the Agency to remove Alberto from her care. She said Alberto was a beautiful, bright, charming child. She wanted to adopt him but felt his emotional and behavioral needs were beyond her capabilities. Grandmother was willing to adopt D.V. Grandmother said the children had complicated relationships with their mother but loved her very much.

Alberto was placed with his foster youth mentor and his wife, who had an approved adoptive home study. Alberto appeared very happy to be with his foster parents. He was two years behind grade level in reading. His behavior was fine. D. telephoned Alberto on approximately half the scheduled times. Alberto did not ask to telephone or visit his mother. He was very attached to Grandmother and telephoned her two or three times a day. His foster parents facilitated weekly visits with Grandmother and siblings.

4

D. participated in a bonding study with the children in October. She had not seen them in several months. D.V. sat in her lap. They called her "mommy" or "mom." D. related to her children in a loving and highly involved fashion. She was affectionate, playful, and balanced in engaging with each child.

The section 366.26 hearing was delayed to provide notice to the children's father in Mexico under the Hague Service Convention. (*In re Alberto F.*, *supra*, D065597.) The hearing was eventually held on March 11, 2015, almost two years after the 18-month review hearing.

At the hearing, the parties submitted on documentary evidence, including the Agency's reports, delivered service logs, visitation narratives, and Alberto's and D.V.'s stipulated testimonies. The Agency reported that D. had a history of inconsistent visitation. D. was not allowed to visit the children until June 24, 2012, because of a criminal protective order. After it was lifted, D. visited the children twice in three months. In July, the social worker could not reach D. to schedule visits.

By February 2013, D. was visiting the children once a week. When D. did visit the children, the visits were positive, and the children were happy and excited to see her. The social worker made a referral to a visitation center in May 2013. The center tried to contact D. but she did not return their calls. By late July, the referral was set to close. During that time, the social worker supervised four visits.

In January 2014, the Agency was supervising visits because D.'s referrals to a visitation center had been terminated. D. visited the children on February 7. She cancelled visits on February 14 and 21. D. told Grandmother she was entering a

5

substance abuse treatment program at Volunteers of America (VOA) and would not be able to have any contact with the children for 15 days. D. did not attend a visit with the children on February 28. She did not telephone Alberto on his birthday the following week. The children believed she was in a substance abuse program and could not contact them. There was no record of D.'s enrolling or having an intake assessment at VOA. A warrant was issued for D.'s arrest on probation violations on March 3. Approximately a month later, D. turned herself in and was in custody.

In March 2014, a social worker explained the differences between adoption, guardianship, and long-term foster care to Alberto. Alberto asked if he would be able to see his mother and sisters if he were adopted. The social worker told him he would always have contact with his grandmother and if his mother and sisters were doing well, his caregivers would allow contact. Alberto said, "[Y]es, I want to be adopted." When the social worker asked him if he knew what that meant, Alberto replied, "[Y]es, like I said I want to stay here and be adopted." Alberto's caregivers were committed to adopting him. Grandmother was committed to adopting D.V.

D. visited the children twice in May, once in June, twice in July, twice in August, three times in September, and once in October 2014. She missed three scheduled visits in September and October. The visitation center declined to supervise future visits. The social worker supervised a visit on November 7. Visits took place on December 5 and 19, 2014, and January 9, 23 and 30 and February 6 and 27, 2015.

The social worker spoke to Alberto and D.V. about adoption in March 2015. D.V. said she wanted her Grandmother to adopt her but would be sad if she could not

6

visit her mother. When asked why, D.V. said she missed her younger half sister. Alberto was reserved about discussing adoption. He was not opposed to adoption but wanted the juvenile court judge to make that decision. He said he loved his mother and did not want to hurt her feelings.

The social worker stated that both children were thriving. There were no concerns about Alberto's behavior. Academically, he was performing at grade level or above. His caregivers were open to continued contact with his birth family. D.V. was thriving. Her grades were above standard or excellent. The children were outgoing, beautiful, creative, artistic, and adorable.

In stipulated testimony, Alberto said he wanted the judge to decide whether he would be adopted. He enjoyed visiting his mother and would be sad if he could not see her. D.V. said she liked visiting her mother and would be sad if she could not see her. She would like to speak to her mother by telephone once a week.

The juvenile court found that D. did not maintain regular visitation and contact with the children. Although there were times when she regularly visited the children, there were periods in which she did not show up for visits. Further, the benefits of maintaining the parent/child relationship did not outweigh the benefits of adoption to each child. Alberto's caregivers were able to focus on his needs. He was much better off than he had been in 2013, and had blossomed academically and emotionally. D.V. had received consistent, loving care from her Grandmother and was thriving. The evidence clearly showed that the children loved their mother and wanted their visits with her to continue. However, D.'s relationships with the children were more peer-to-peer than

parent to child, and termination of parental rights would not deprive the children of a substantial, positive emotional attachment such that they would be greatly harmed.

The juvenile court found that the children were adoptable and that the beneficial parent/child relationship exception did not apply. The court terminated parental rights and designated the children's respective caregivers as their prospective adoptive parents.

## DISCUSSION

### A

D. contends the juvenile court erred when it terminated parental rights to Alberto and D.V. because the evidence established she maintained regular contact and visitation with her children and they would benefit from continuing that contact. (§ 366.26, subd. (c)(1)(B)(i).) D. argues the children lived with her for a significant period of time and she was an important person in their lives.

At a section 366.26 hearing, the court may select one of three permanency plans: adoption, guardianship, or long-term foster care. (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7.) There is a strong preference for adoption over alternative permanency plans. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588-589.) If the court determines the child is likely to be adopted, the burden shifts to the parent to show by a preponderance of evidence that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from

8

continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This court has interpreted the phrase " 'benefit from continuing the . . . relationship' " to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging that a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

We determine whether there is substantial evidence to support the court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) If there is substantial evidence supporting the court's ruling, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c). (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)[5]

B

---

[5] The Agency urges this court to discard the long-established substantial evidence standard of review of orders terminating parental rights (see, e.g., *Autumn H., supra,* 27 Cal.App.4th at p. 576), and instead adopt a hybrid standard of review. We decline to do so here.

9

There is substantial evidence to support the juvenile court's finding that D. did not maintain regular visitation and contact with Alberto and D.V. D. was arrested in August 2011 on charges of child endangerment. She resisted substance abuse treatment and tested positive for drugs in November. D. was subject to a restraining order until May 2012. After the restraining order was modified and she was released from jail, she telephoned the children twice and visited them twice during a three-month period. D. could not explain her absence to the social worker.

By January 2013, D.'s visits with the children were going well and the Agency lifted supervision requirements. However, two weeks later, D. tested positive for methamphetamine. Her visits with the children again became sporadic. A referral for weekly visitation at a visitation center was closed because D. did not return the center's calls. A social worker supervised four visits from May to July. In October, D. saw Alberto and D.V. for the first time in several months.

In 2014, a social worker was supervising visits because a visitation center had terminated D.'s visitation services. D. had several visits with the children in January and one in February. She then cancelled the other visits in February and did not telephone Alberto on his birthday. In April, D. was in custody on probation violations. Starting in May, D. was sporadically visiting the children. She missed three scheduled visits in September and October, and again lost her visitation center referral. A social worker supervised a visit in November. D. visited the children twice in December 2014, three times in January 2015, and twice in February.

D. states she was not responsible for all the missed visits during the year preceding the section 366.26 hearing. The record shows the children cancelled visitation to play with friends and go on outings with their respective caregivers. At other times, D. cancelled visits because of illness or lack of transportation. She argues that in view of her established relationship with her children, attending 25 out of 34 possible visits during the past year meets the standard for regular visitation and contact with the children. We disagree with both her statistics and her conclusion.

After D. was released from jail in June 2012, the Agency offered her weekly visitation with the children. Thus, she was given the opportunity to visit her children approximately 26 times in 2012, 52 times in 2013, 52 times in 2014, and 10 times to the date of the Agency's March 11, 2015, addendum report, for a total of approximately 140 weekly visits. Had she maintained regular visitation and participated in services, D. could have had unsupervised visitation with the children, with an increase in frequency and length. Instead, she was not amenable to substance abuse treatment and other recommended services. She did not comply with probation requirements. The record permits the reasonable inference that D.'s repeated failures to maintain regular visitation and contact with the children were drug related. Thus, D. did not show the type of constant devotion and commitment to her children that characterize a beneficial parent/child relationship. (See, e.g., *In re S.B.* (2008) 164 Cal.App.4th 289, 300-301 [exception applied where the parent fully complied with services, maintained regular contact and visitation with his child, and voluntarily continued his efforts to remedy the underlying protective issues].)

By the time of the section 366.26 hearing, Alberto and D.V. had been out of D.'s care for more than three and a half years. They were each thriving in the homes of their respective caregivers, including periods in which they did not have any contact or visitation with D. D.V. wanted her Grandmother to adopt her. Alberto wanted to stay with his caregivers and did not object to adoption. Thus, the record supports the juvenile court's finding that termination of parental rights would not deprive Alberto and D.V. of a substantial, positive emotional attachment such that they would be greatly harmed. (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)

We conclude that the juvenile court did not err when it found that D. did not meet her burden under section 366.26, subdivision (c)(1)(B)(i) to show she maintained regular visitation and contact with Alberto and D.V. The children have a compelling right to a stable, permanent home with a fully committed caregiver. (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1348.)

## DISPOSITION

The orders terminating parental rights are affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.

12