Filed 8/12/16  In re J.R. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065405 |
| Plaintiff and Respondent, | (Super.Ct.No. J249344) |
| v. | OPINION |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant A.R. (Mother) appeals from the juvenile court's order terminating her parental rights as to her four-year-old daughter, J.R.[1] Mother's sole contention on appeal is that the juvenile court erred in failing to find the beneficial parent-child relationship exception to termination of parental rights applied. We reject this contention and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

On May 8, 2013, the San Bernardino County Children and Family Services (CFS) filed a petition on behalf of the child pursuant to Welfare and Institutions Code[2] section 300, subdivisions (b) (failure to protect) and (g) (no provision for support) based on Mother's mental health illness and the alleged father's whereabouts being unknown. The child was formally detained on May 9, 2013, and placed in a foster care home.

The social worker recommended that the allegations in the petition be found true and that Mother be provided with reunification services. Mother had a long history of mental health issues dating back to 2008, which included multiple hospitalizations and suicide attempts. She was a dependent of the juvenile dependency court when she was a minor. She received various services for mental health during her dependency proceeding. She was diagnosed with post-traumatic stress disorder, which she said was a

_____

[1] The alleged father is not a party to this appeal.

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

result of being sexually abused by a maternal great uncle, and major depressive disorder, and was prescribed medication. She stopped seeking treatment and taking her medication after her case was closed.

Since the child's birth, Mother had two hospitalizations for mental health issues. The first hospitalization was in October 2012 after she stopped taking her prescribed medication. Her most recent hospitalization was in April 2013 after she broke a bottle, started cutting herself, and running through traffic while being driven home by school personnel. She was diagnosed with bipolar disorder and was prescribed medication. On May 6, 2013, CFS determined Mother still had unresolved mental health issues and detained the child. Mother believed that she did not have a bipolar disorder or that she required medication but claimed she would take it to get her child back. CFS was concerned whether Mother would remain compliant with her medication after the dependency case for the child closed. Mother had shown a pattern of taking her medication for short periods of time but discontinuing them as soon as she felt she no longer needed them. CFS was also concerned that the family and the maternal grandmother did not believe Mother's health issues were a concern and that Mother did not know what her triggers were for the mental health episodes.

The social worker observed a noticeable difference in Mother's behavior and appearance since she had reportedly been consistent in taking her medication. At the initial interview on May 3, 2013, Mother presented with a flat affect and a sense of disconnect with her environment. This was based on her disheveled appearance and lack

of eye contact. However, when meeting with Mother on May 15, 2013, the social worker noted that Mother made frequent eye contact, occasionally smiled and was appropriately dressed. Nonetheless, Mother continued to state that she felt she did not need the medication. Mother had a visit with the child that went well. Mother was very affectionate towards the child, and the child cried when Mother placed her in her car seat. However, the caretaker was able to console the child. The caretaker reported that Mother appeared " 'childlike.' "

Following a mediation, on July 2, 2013, the juvenile court sustained the petition and declared the child a dependent of the court. The court returned the child to Mother's custody under a family maintenance plan on the condition Mother reside with the child at the maternal grandmother's home.

On September 25, 2013, Mother engaged in cutting behaviors while at school. In addition, while being transported home from school in a van with other students, Mother acted violently, threw items at the driver, and threatened to kill everyone in the van by grabbing the steering wheel of the vehicle. Mother reported that she was not able to take her morning medication for one week because her medication was at school. She also said that it was stressful living with the maternal grandmother because they constantly argued and that she stopped attending counseling due to child care issues and problems with the therapist. Mother also noted that she had recently used "speed," smoked marijuana, and drank alcohol.

On October 3, 2013, a section 387 supplemental petition was filed based on Mother's ongoing mental illness. The child was detained and Mother was provided with supervised visitation and services.

On October 11, 2013, Mother enrolled in the STAY program, which provided therapy, daily living skills, substance abuse counseling, psychiatric monitoring, and a nurse. The child was placed in her previous foster home on October 1, 2013, and was observed to be talking, playing, and laughing with the foster family. She was also able to express her wants and needs and appeared more comfortable in her placement than she had previously. The social worker observed the first visit between Mother and the child since her second removal. When the child first saw Mother, she had a frown and was holding back from crying. For the first hour the child sat on Mother's lap and just wanted to hug her. At the end of the visit, the child started crying and did not want to leave Mother.

On October 25, 2013, the court sustained the allegations in the supplemental petition, and provided Mother with reunification services.

At the January 2, 2014 six-month status review hearing, the juvenile court ordered additional reunification services for Mother and authorized unsupervised visits. Although Mother had been hospitalized in November 2013 for attempting to harm herself, since then she had been actively participating in the STAY program and taking her medication. The social worker opined that Mother and the child had a strong bond

and recommended unsupervised and overnight visits once Mother obtained housing. Meanwhile, the child was adjusting to her foster care placement and developing well.

On March 25, 2014, CFS requested Mother's unsupervised visits return to supervised. She had been terminated from the STAY program and was only able to return if she agreed to enter an inpatient drug treatment program. The social worker attempted to find a program for Mother, but she did not want to attend or could not attend because of school. CFS continued to offer programs to Mother, including substance abuse and housing, but she continued to decline any assistance from CFS or outside resources. On April 17, 2014, Mother entered a substance abuse treatment program, but she left the following morning. When asked why she left, Mother said, " 'I don't know. I just didn't like it there.' " She was also offered housing assistance, but she would not accept it because the rules were too strict. Mother repeatedly failed to drug test and admitted to using methamphetamine, but claimed she did not have an addiction and did not want to participate in a substance abuse program. Further, she was not regularly visiting the child, claiming she had transportation issues, even though CFS had assisted with arrangements and confirmed the day prior to visits. The juvenile court subsequently ordered Mother's visits be supervised.

By the 12-month review hearing, CFS recommended terminating reunification services for Mother. Mother continued to struggle with maintaining stable housing and lived between family members. Although Mother began to again engage in services, Mother refused the services offered, continued to be impulsive and unstable, and had

6

been hospitalized three times within the past year. Mother also began to regularly visit the child with family members. The caregiver supervised visits between Mother and the child. Initially, the child would cry upon seeing Mother, and she would cry again at the end of the visits until the caregiver drove away. However, the caregiver recently noticed the child no longer cried before and after visits with Mother. The social worker noted that there still appeared to be a bond between the child and Mother, but the child did not appear to be affected by the visits anymore. The child had adjusted to her placement and was more social and interactive with the caregiver's family.

On August 25, 2014, Mother was asked to leave her drug treatment program, and her counselor recommended a higher level of care. Mother had five incidents of harming herself, including punching a hole in the wall and punching a pole. She also tried to hang herself in the bathroom and had two incidents of cutting her leg, one that required stitches. Her counselor noted that she tried to incorporate techniques to assist Mother, but Mother failed to verbalize when she was having self-harming thoughts, making it difficult to be able to help her cope with her thoughts and emotions at the time.

On August 26, 2014, the juvenile court terminated Mother's reunification services and set a section 366.26 hearing.

CFS recommended termination of parental rights and requested a three-month continuance to assess adoption of the child with her current caretaker. The child had lived with Ms. S. since October 2013, and was healthy and developmentally doing well. She was described as a very happy, joyful, and active child. However, her speech was

extremely limited and Ms. S. believed that she may have a speech delay. Ms. S. also believed the child had attachment issues because she would scream for hours when she was left with or had to go with someone she did not know.

Mother had regularly visited the child one time per week for two hours since November 2014. Prior to that, Mother visited the child three times per month and was often extremely late. Mother had never changed the child's diaper during visits or provided any other type of care for her. When the child was initially removed, she often cried and screamed for Mother as the visits were ending, but the child had not been crying for the past eight to 10 months. Ms. S. expressed an interest in adopting the child, and CFS required additional time to assess Ms. S.

On December 4, 2014, Mother filed a section 388 petition contending that she entered the STAY program on August 21, 2014, and successfully completed the program on October 16, 2014. She requested that the child be returned to her or her services be reinstated. She also requested more frequent, unsupervised, and overnight visits.

The juvenile court continued the matter to allow CFS to assess Ms. S. and set a hearing on the section 388 petition for February 3, 2015.

CFS recommended that reunification services and more frequent, unsupervised visits be reinstated for Mother. Mother was participating in the TAY Center program, which included counseling, anger management, life skills, and substance abuse. She also continued to take her medication. She resided with the maternal grandmother and was working. In addition, Ms. S. was no longer able to adopt the child.

8

On February 3, 2015, the court granted Mother's section 388 petition, ordering additional reunification services for Mother.

By the 18-month review hearing, CFS recommended terminating reunification services for Mother and setting a section 366.26 hearing. Although Mother had demonstrated growth and maturity since the inception of the case two years ago by understanding the need to address her own history to overcome her substance abuse and mental health issues and she had completed high school, obtained a job, lived on her own for a while and recognized when she needed to ask for help, the social worker did not believe Mother demonstrated she benefitted from services in order to provide long-term stability for the child. In April 2015, Mother was authorized to have unsupervised visits with the child. In May 2015, Mother informed the social worker that she had relapsed and used methamphetamine but she was now in a program. In July 2015, Mother was terminated from the program due to a conflict with another client and her language toward staff. Mother enrolled in a new program and the social worker allowed Mother to continue to have unmonitored visitation at the treatment center.

In June 2015, the child was placed in the home of Mr. and Mrs. P., who desired to adopt her. The caretakers reported that she transitioned easily into their home and she referred to them as " 'mommy' " and " 'daddy.' " Mother missed several visits with the child in May 2015 due to going through detox and the child's former caretaker's inability to transport the child. However, in June 2015, Mother's visits resumed, and there were no reported concerns. The child's current caretakers denied the child asked for Mother,

but noted the child became upset when Mother cancelled a visit right before the visit was about to start.

At the August 6, 2015 18-month review hearing, the court terminated Mother's reunification services and set a section 366.26 hearing.

On November 13, 2015, Mother filed another section 388 petition requesting that the child be returned to her care or, alternatively, reunification services be reinstated. The court denied the request without a hearing.

CFS reported that the child was moved into her current prospective adoptive placement with Mr. and Mrs. Y. on August 27, 2015. The child appeared secure and well-adjusted in her placement and sought out the prospective adoptive parents for comfort and affection. The child was described as outgoing and friendly with no behavioral concerns and was observed to be playful and active. The prospective adoptive parents and the child were developing a strong attachment, and the child recognized them as her parental figures. The prospective adoptive parents desired to adopt the child and provide her with stability and security. They noted that they loved the child. Mother continued to consistently visit the child. The child was "quiet and standoffish in the beginning," but overall the visits reportedly went well.

The contested section 366.26 hearing was held on February 4, 2016. At that time, Mother testified that she and the child had a bond, and they would both be devastated if parental rights were terminated. She also testified that she visited the child once a week for two hours. She acknowledged that she had never had overnight or weekend visits

10

with the child.  Following arguments, the juvenile court found that Mother had consistently maintained visitation with the child and that there was some bonding, however, the court concluded the child required permanency.  The court explained, "I think [the child] has some bonding to her mother.  I think that they have had frequent and loving contact.  But I don't find that that is sufficient to outweigh the benefits of giving this child some permanency."  The court further noted that the child had "been out of the mother's care for 70 percent of her life, I think the time has come where the focus is completely on [the child] and no longer on the very valid affection that the mother has for her."  In conclusion, the court determined the parent-child bond was not sufficient to outweigh the benefit of adoption.  As such, the court found the child to be adoptable and terminated parental rights.  This appeal followed.

II

DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights.  We disagree.

This "may be the most unsuccessfully litigated issue in the history of law."  (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, overruled on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)  While it can have merit in an appropriate case (e.g., *In re S.B.* (2008) 164 Cal.App.4th 289, 296-301), this is not such a case.

In general, at a section 366.26 hearing, if the juvenile court finds that the child is adoptable, it must terminate parental rights. (§ 366.26, subds. (b)(1), (c)(1).) This rule, however, is subject to a number of statutory exceptions (§ 366.26, subds.(c)(1)(A) & (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235, italics added.)

" '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' [Citation.]" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938 (*Jason J.*).) " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court

12

should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.' [Citation.]" (*Id*. at p. 937.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1419.) "The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.)

The parent contesting the termination of parental rights bears the burden of showing both that a beneficial parental relationship exists and that severing that relationship would result in great harm to the child. (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314-1315.) A juvenile court's finding that the beneficial parental relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion. The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*In re Celine R*. (2003) 31 Cal.4th 45, 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion. (*In re Bailey J*., *supra*, at pp. 1314-1315; accord, *In re K.P*. (2012) 203 Cal.App.4th 614, 621-622.) A juvenile court's ruling on whether there is a " 'compelling reason' " is reviewed for abuse of

discretion because the court must "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, *supra*, at p. 1315, italics omitted.)

Here, there is no dispute Mother had maintained regular contact and visitation with the child. However, the evidence fails to show Mother's relationship with the child promoted the child's well-being to such a degree as to outweigh the well-being she would gain in a permanent home with a new, adoptive parent. (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) While there was evidence of some bonding between the child and Mother, it was insufficient to outweigh the benefits of finally providing the child with permanency and stability. Mother has a long history of mental health issues and substance abuse that significantly impacted her ability to parent the child. The child was 17 months old when she was removed from Mother's custody, and four years old at the time of the section 366.26 hearing. As the juvenile court noted, by the time of the section 366.26 hearing, the child had been "out of the mother's care for 70 percent of her life."

Furthermore, there was no evidence that the child would be harmed, much less "greatly harmed," by termination of parental rights. (*In re B.D.*, *supra*, 159 Cal.App.4th at pp. 1234-1235.) Although the child would initially cry when she would see Mother, and she would cry at the end of visits until her caregiver drove away, as more time elapsed, the child would not cry before or after visits with Mother. During the course of

14

the dependency, Mother never had any overnight or weekend visits and she was never observed to be changing the child's diaper. Thus, there was minimal positive or negative impact on the child regarding continued contact with Mother.

Moreover, while there is some evidence supporting a finding of a positive relationship between Mother and the child, there is also evidence supporting a reasonable conclusion that the child would gain a greater benefit from being placed in a permanent adoptive home. Mother simply did not meet her burden to show that the bond between her and the child was so strong and beneficial to the child that it outweighed the benefit the child would receive from having a stable, permanent adoptive home. The child was 17 months old when this case commenced and four years old at the time of the section 366.26 hearing. During that time, the child had been out of parental custody for over two years and had been shuffled between Mother and numerous placements. The child urgently required permanence and stability. The child's current caregivers, whom she had lived with since August 2015, desired to adopt the child and provide her with the stability and security the child required. In addition, the child and her caregivers were forming a strong mutual, loving bond. The child was doing very well in her current caregivers' home and she was thriving.

Mother relies on *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*) to support her contention that she established the beneficial relationship exception. But the following brief description of *Amber M.* demonstrates that *Amber M.* offers no support for Mother's claim of error. "In [*Amber M.*], the court reversed termination of parental

rights where a psychologist, therapists, and the court-appointed special advocate uniformly concluded 'a beneficial parental relationship . . . clearly outweigh[ed] the benefit of adoption.'  Additionally, two older children had a 'strong primary bond' with their mother, and the younger child was 'very strongly attached to her.' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 533 (*J.C.*).)  No such evidence of a bond or the existence of a beneficial relationship was presented in this case.

Mother also relies on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*).  In *S.B.*, a three-year-old child was removed from the custody of her father who had been her primary caregiver.  The father immediately acknowledged his drug use was untenable and fully complied with his case plan, remained drug free, and regularly visited his daughter three days a week.  (*Id.* at pp. 295, 298.)  Even after a year apart, when the visits ended, the child continued to become upset and wanted to leave with her father.  (*Id.* at p. 298.)  The appellate court reversed the termination of parental rights, finding substantial evidence to support application of the section 366.26, subdivision (c)(1)(B)(i) exception on the basis of an emotionally significant relationship arising from the frequent and loving visits between parent and child.  (*S.B.*, *supra*, at pp. 298-299.)

Since its publication, *S.B.* has been subject to considerable criticism, particularly for its suggestion the exception applies if the child will merely "derive[] some measure of benefit" from the parental relationship.  (*S.B.*, *supra*, 164 Cal.App.4th at p. 301.)  In *Jason J.*, *supra*, 175 Cal.App.4th at page 937, the same court that decided *S.B.* cautioned: "The *S.B.* opinion must be viewed in light of its particular facts.  It does not, of course,

stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." In *In re C.F.* (2011) 193 Cal.App.4th 549, the same court once again emphasized that *S.B.* must be "confined to its extraordinary facts. [*S.B.*] does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*Id.* at pp. 558-559.)

In any event, unlike S.B.'s father, who had "complied with 'every aspect' of his case plan," Mother here did not always maintain her sobriety and take her medication for her mental health issues and relapsed several times. (*S.B.*, *supra*, 164 Cal.App.4th at p. 298.) Mother had not demonstrated an ability to provide the child, over the long term, with a stable, safe, and loving home environment. Further, there was no evidence in the record before us that the child would suffer detriment if parental rights were terminated, unlike the daughter in *S.B.* The child did not display the depth of emotional attachment to Mother that S.B. displayed to her father. As time elapsed, the child easily separated from Mother and ceased to cry before and after visits. Moreover, while Mother was loving towards the child during visits, unlike the father in *S.B.*, Mother was not described as parental towards the child. It was noted during visits that Mother never changed the child's diaper or provided any other type of care for her. Accordingly, the juvenile court had ample evidentiary support in finding there was no beneficial parental relationship sufficient to overcome the statutory preference for adoption.

In conclusion, at most, all Mother can demonstrate is "frequent and loving contact or pleasant visits," which has repeatedly been found insufficient to support application of the exception.  (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)  We conclude that the juvenile court did not err in finding that Mother failed to meet her burden of showing the parental beneficial relationship exception applied.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:


McKINSTER

J.


MILLER

J.