Filed 2/22/22  In re S.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | B313169 (Los Angeles County  Super. Ct. No. 18CCJP06480) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>R.R. et al.,<br><br>    Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marsha Matthews, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant R.R.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant Maria M.

Rodrigo A. Castro-Silva, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Sophie R. (born Oct. 2014) was declared a dependent of the juvenile court in November 2018, when the court sustained a petition in which respondent Los Angeles County Department of Children and Family Services (DCFS) alleged that mother endangered Sophie by leaving her unattended in a car, and that mother had a history of mental and emotional problems. In October 2018, DCFS removed Sophie from mother's home and placed her in the home of her paternal great aunt and uncle. The court ordered family reunification services for parents but terminated them two years later and set a permanency planning hearing. At that hearing (in May 2021), it was undisputed that the paternal aunt and uncle would likely adopt Sophie. (See *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Father, however, asserted the "beneficial parental relationship exception" to termination of parental rights. (*Ibid.*) The juvenile court rejected the exception and terminated father's parental rights, along with those of mother.

On appeal, father contends the juvenile court erred when it did not apply the beneficial parent relationship exception. Mother raises no independent contention of error, instead contending only that we must reverse the termination of her parental rights if we reverse the termination of father's rights. We conclude that the juvenile court did not err in rejecting the beneficial parental relationship exception. Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Relevant Events Leading to the Permanency Planning Hearing*

The family had an extensive history of prior referrals to DCFS. On October 1, 2018, DCFS received a referral alleging general neglect of Sophie by mother. At the time, father lived in Mexico, worked in San Diego, and

stayed at mother's home only on the weekends. Sophie was detained and placed with paternal great aunt and uncle. On October 9, 2018, DCFS filed a dependency petition on behalf of Sophie.

On October 10, 2018, the juvenile court found a prima facie case for detaining Sophie and ordered monitored visitation. Over the next month and half, the parents visited Sophie together on a weekly basis, with paternal great aunt (hereafter, aunt) supervising. Aunt reported that father called Sophie via video-chat.

On November 29, 2018, the juvenile court adjudicated the petition and declared Sophie a dependent under Welfare and Institutions Code section 300, subdivision (b),[1] based on mother's mental and emotional problems and mother leaving Sophie unattended in the car. The court removed Sophie from parental custody and ordered Sophie to be suitably placed under the supervision of DCFS. The court also ordered DCFS to provide family reunification services and monitored visitation. Sophie remained placed with paternal great aunt and uncle.

At the six-month review hearing, DCFS reported father had not made himself available to DCFS. He reported enrolling in domestic violence counseling and parenting classes, but the social worker was unable to confirm his enrollment or progress. Father had consistently visited Sophie every Sunday. Despite aunt advising father to avoid letting Sophie play with electronical instruments, father allowed Sophie to constantly play with his phone during the visits. Also, father's interactions with Sophie were limited during the visits, and aunt often had to guide father to play games or do other activities with Sophie. The court continued reunification services.

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

At the 12-month review hearing, DCFS reported father completed a parenting program and enrolled in counseling; however, he made little progress in his treatment. Father continued to visit Sophie weekly. During his visits, father "continue[d] to struggle with setting boundaries, engaging with Sophie, and implementing rules or discipline." The court found father was in substantial compliance with the case plan. Over DCFS's objection, the court ordered continued reunification services. The court further ordered DCFS to liberalize father's visitation to unmonitored and gave DCFS discretion to allow for weekend and overnight visits.

The juvenile court continued the 18-month review hearing several times. DCFS reported father completed his court-ordered case plan. Father had been living in a room at a tire shop since January 2020, but he was looking for appropriate housing for Sophie. Father was not working consistently due to the COVID-19 pandemic and modified his visits with Sophie to virtual because of her asthma. Father admitted to having some struggles redirecting Sophie, and aunt reported she would often step in to assist him. However, aunt stated father's interactions with Sophie had improved.

By August 2020, in-person visits resumed, but father visited only once a month. Father would call if he missed a visit but did not call any other day of the week. Moreover, father had a difficult time setting boundaries with Sophie. He explained, "[T]his is my only time to see her, so I'm going to give her what she wants."

DCFS was concerned about father's ability to be forthcoming and his willingness to protect Sophie from mother. For example, Sophie was detained from mother at the beginning of the dependency case and a safety plan was created to allow Sophie to stay with relatives. However, father

4

picked Sophie up from the relative's care and returned Sophie to mother. Most recently, when aunt asked father for his consent to have Sophie assessed for therapy, he responded by giving her mother's phone number to obtain consent.

By October 2020, father had obtained appropriate housing. Although his visits were liberalized to unmonitored, he did not exercise them. The social worker and aunt went over Sophie's schedule and appointments with father and invited him to attend wraparound sessions and team meetings. DCFS created an unmonitored visitation schedule for father that included overnight visits.

Father reported the visits went well, but Sophie had a difficult time falling asleep at night. Aunt similarly reported the visits went well, but Sophie had become more argumentative and defiant in the home after her visits with father. On Sophie's first overnight visit, father returned Sophie to aunt's home more than five hours late without calling to inform aunt. The second overnight visit was scheduled during the week so father could experience having Sophie in his home during the school day. Aunt set up an internet hotspot in father's home and gave him instructions on how to access Sophie's online school. However, father was unable to access the school, so instead he took Sophie to the beach. On the third scheduled overnight visit, father failed to show up and did not call to cancel the visit. Father's subsequent overnight visit was without incident. Father did not speak to Sophie outside of these visits.

Father met regularly with Sophie's wraparound therapist, who reported her concerns about father's ability to manage Sophie's needs with her appointments, services, and the transition of locating a daycare and school if Sophie returned to him. She also reported father had difficulty

5

connecting to services and worried father would need more support in this area. Additionally, she was concerned father would not be able to keep up with Sophie's many appointments.

Sophie's behavior had regressed during this period. She had asked aunt why she was forced to go with father. Aunt explained to her that she was not forcing her, and that Sophie had a choice. When asked by the social worker if she wanted to live with father, Sophie responded that she wanted to live with aunt. Sophie also reported that she saw mother during one of father's visits.

The court found father's compliance with the case plan had not been substantial. The court terminated reunification services and referred the matter for a permanency planning hearing.

B. *Permanency Planning Hearing*

In December 2020, father had a few overnight visits with Sophie. The social worker expressed an ongoing concern about father not being able to correct Sophie's behavior, allowing unauthorized individuals to provide care for Sophie, and visiting with a relative exposed to COVID-19. Aunt also reported father did not provide structure or rules for Sophie, and she tended to be reluctant to follow the household rules when she returned from visits. Therefore, DCFS directed that the visits revert to unmonitored day visits.

Sophie continued to participate in wraparound services, which aunt reported were helpful, but aunt stated she had difficulty addressing consistency of care when Sophie returned from her visits with father. Father undermined aunt by telling Sophie that aunt "complains a lot," and he encouraged Sophie to keep things from aunt. Sophie expressed wanting to remain with paternal great aunt and uncle.

In April 2021, father's overnight visits with Sophie resumed. Father continued to undermine aunt and did not allow Sophie to call her during the visits. Father also bought Sophie a phone and asked her to keep it a secret from aunt. When confronted by a social worker, father denied it.

Aunt expressed her frustration that Sophie struggled with sleep when she was at father's home. Father did not have a bedtime routine for Sophie. Father also allowed Sophie to watch "zombie" movies and stay up late watching her tablet. Although the social worker and wraparound team continued to work with father to establish a routine for Sophie, father did not follow through with the advice. Sophie was generally behaving better but continued to struggle for a day or two after visits with father.

On May 27, 2021, the juvenile court held the permanency planning hearing. The court received DCFS reports in evidence and heard testimony from Sophie and father.

Sophie testified she called father, "Dad." Sophie stated she visited father every week and saw him on Saturdays and would spend the night. Sophie hugged father when he picked her up for the visits. During her visits, father took her to her grandmother's house, the park, the store, and to his house. Sophie testified she had fun with father at the park and liked spending time with him. When her visits would end on Sunday, Sophie stated she felt good because she could then play with her foster siblings. Sophie also said she missed father during the week. During their phone conversations, Sophie told father she loved and missed him.

Father's testimony echoed Sophie's. On cross-examination by Sophie's counsel, father testified he wanted more time with Sophie. However, when asked if he requested more time, father responded he had not asked "the lady," referring to aunt, until the social worker granted him permission.

7

When pressed, father stated he did not ask the social worker for permission, but he intended to ask. Father testified that Sophie had a bedtime routine. When asked if she ever watched any "zombie" movies, he stated she did once on PBS when he was "a little distracted that day." Father testified Sophie saw a doctor once or twice a year, but he had not attended any of those appointments. On cross-examination by DCFS's counsel, father testified he did not know the name of her doctors or teachers. When asked if he ever purchased a cell phone for Sophie, father responded an attorney gave him "a little tablet" and it was not "activated." Father admitted he asked Sophie to keep it a secret from aunt because "there are rules there."

The court stated its tentative ruling was that the beneficial parental relationship exception did not apply. Sophie's counsel agreed. Father's counsel argued, however, that he had both maintained consistent visitation, and that Sophie would benefit from a continued relationship.

After hearing argument from counsel, the court noted that whether termination of parental rights was appropriate was a close question because father had progressed to unmonitored and overnight visits. Father was the non-offending parent, and throughout the dependency case, father had "stepped up" and visited Sophie more frequently and established a residence where he could have overnight visits.

The court concluded, however, that father had not demonstrated that he was ready to assume full-time parental care of Sophie during the actual reunification period. In fact, most of the overnight visits occurred at the end of the reunification period. There also continued to be issues about father's conduct during visitation, in that he left Sophie with mother and with babysitters not approved by DCFS. Further, father did not possess the

"appropriate parenting skills in terms of basic things like bedtime and preventing the child from seeing scary, age-inappropriate movies."

Although father's testimony appeared credible in terms of his affection for Sophie and wanting to maintain a relationship, the court found his answers to both Sophie's and DCFS's counsel extremely vague and evasive. Father had not asked DCFS for more visitation with Sophie at any point and essentially encouraged Sophie to break her caregiver's rules. Father's reference to Sophie's caregiver, who had taken care of Sophie for the last two and a half years, as "lady" was disrespectful and showed a lack of insight. Also, father admitted he was actively undermining the rules of Sophie's caregiver. Finding it would be detrimental to return Sophie to her parents and no exception to adoption applied, the court terminated parental rights. Paternal great aunt and uncle were designated as Sophie's prospective adoptive parents.

Father and mother timely appealed.

## DISCUSSION

Father contends that he established the beneficial parental relationship exception to termination of parental rights. We disagree and affirm the juvenile court's contrary finding.

### A. *Applicable Law*

Once the juvenile court terminates reunification services and determines a dependent child is adoptable (a finding not in dispute here), it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several

9

statutory exceptions.  (§ 366.26, subd. (c)(1); *Caden C., supra,* 11 Cal.5th at pp. 630–631.)

The beneficial parental relationship exception, at issue here, applies where the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)  Our Supreme Court recently clarified the three elements a parent must prove, by a preponderance of the evidence, to establish the exception:  (1) the parent's regular visitation and contact with the child; (2) the child's "substantial, positive, emotional attachment to the parent," "the continuation of which would *benefit* the child"; and (3) that the termination of "that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)

The first requirement, regular visitation and contact, is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'"  (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.'" (*Caden C., supra*, 11 Cal.5th at p. 632.)  "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid*.)  Focusing on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)  Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," the Supreme Court stated "it is not necessary—even if it were possible—to calibrate a precise 'quantitative

measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.'" (*Ibid.*)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra*, 11 Cal.5th at p. 633.) "[C]ourts need to determine . . . how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Thus, "'[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Ibid.*)

We review for substantial evidence the juvenile court's findings on whether the parent has consistently visited the child and whether a beneficial parental relationship exists. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) We review for abuse of discretion the court's finding as to whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship. (*Id.* at p. 640.) Nevertheless, we review for substantial evidence any factual findings underlying the juvenile court's weighing of the harm of losing the relationship against the benefits of adoption. (*Ibid.*) This "hybrid standard" *Caden C.* endorsed "simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Id.* at p. 641.)

11

B. *Analysis*

Father demonstrated that he maintained regular visitation and contact with Sophie. Thus, the first element of the beneficial parental relationship exception is satisfied.

Father contends the juvenile court found, in substance, that he had a significant relationship with Sophie. Therefore, the court should have found that she would benefit from a continuing relationship. However, although the court recognized the strong bond between Sophie and father, the court ultimately determined that the relationship was actually detrimental, not beneficial, to Sophie's well-being. (*Caden C., supra*, 11 Cal.5th at p. 632 [factors include "'the "positive" or "negative" effect on interaction between parent and child'"]; see *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [the exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent"].) The court found there continued to be issues with the way father conducted himself during his visits with Sophie. The court was particularly troubled that father would undermine aunt by refusing to enforce rules, speaking negatively about aunt, and encouraging Sophie to hide information from her. Indeed, father admitted doing these things.

At the beginning of the case, at the time of detention, Sophie was three years old and solely in mother's custody and care. She spent the next three years with her paternal great aunt and uncle. Father was not very involved in Sophie's life prior to court intervention, because he was living in Mexico and working in San Diego. While Sophie enjoyed her visits with father, there was no evidence that separating from father at the end of those visits caused her any emotional trauma. In fact, Sophie testified she felt good at the end of

12

her visits because she could play with her foster siblings. DCFS reported father's interactions with Sophie during the day visits were limited, and aunt often had to guide him. Father continued to struggle with engaging with Sophie, setting boundaries, and implementing rules or discipline. Aunt reported Sophie became argumentative and defiant in the home after the visits. Sophie also struggled with sleep when she was in father's home, which affected her for a day or two after the visits. Sophie had asked aunt why she was forced to visit with father. When the social worker asked if she wanted to live with father, Sophie responded that she wanted to live with aunt.

On this basis, we conclude that substantial evidence supports the court's finding that despite a bond between Sophie and father, the relationship had a negative, not positive, effect on Sophie. Thus, the second element to the beneficial parental relationship exception was not satisfied.

Moreover, even assuming the second element was met, the juvenile court did not abuse its discretion by determining that any benefit Sophie derived from her relationship with father was outweighed by the benefit she would receive through permanency and stability of adoption. Evidence that Sophie had pleasant visits with father is not enough to preserve parental rights. (See *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 ["The parent must do more than demonstrate 'frequent and loving contact[,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant"].) Paternal great aunt and uncle were able and willing to provide care. Although Sophie testified that she loved father and would be sad if she could not see him, she also told the social worker she wanted to live with aunt. Father's limited relationship with Sophie is not that extraordinary case where preservation of parental rights outweighs the preference for adoption. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

The case on which father principally relies, *in re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), is distinguishable.  In *S.B.*, the father was the child's primary caregiver for three years prior to the child's removal.  (*Id.* at p. 298.) The father maintained consistent and regular visits and complied fully with his case plan.  (*Ibid.*)  After removal, the child continued to show a strong attachment to the father.  (*Id.* at p. 294.)  The social worker noted the father recognized, and was sensitive to, the child's needs.  (*Ibid.*)  DCFS's recommendation to terminate parental rights was based in part on a relative caregiver's intent to continue visits between the child and parent.  (*Id.* at p. 295.)  The juvenile court found the father and child had "an emotionally significant relationship"; however, there was no evidence to suggest the father's relationship with the child was parental in nature or that it would be greatly detrimental to the child to terminate the relationship.  (*Id.* at p. 298.) The court ultimately terminated parental rights in part because the child's caregiver would allow her relationship with her biological parent to continue. (*Id.* at p. 300.)

The appellate court determined that the "only reasonable inference" was that the child would be greatly harmed by the loss of her relationship with her parent and therefore the juvenile court erred when it found the parental beneficial relationship exception did not apply. (*Id.* at p. 301.)  In support of its holding, the court stated that "a parent should [not] be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents." (*Id.* at p. 300.)

Here, it cannot be said that the "only reasonable inference" was that Sophie would be greatly harmed by the loss of the relationship with father. As previously discussed, father had a very limited presence in Sophie's early

life, and then for the almost three-year duration of the dependency case he was unable to appropriately interact with Sophie during visits, and undermined aunt by refusing to enforce rules, speaking negatively about aunt, and telling Sophie to hide things from her.

*S.B., supra,* is further distinguishable because contrary to father's contention, the juvenile court's decision was not based on any promise by paternal great aunt or uncle to continue visitation. The court's comment regarding possible future contact was made on the heels of other statements highlighting the difficulty of making the decision to terminate parental rights. Also, the court's comment does not suggest that it believed potential postadoption contact necessitated a denial of the exception. The totality of the juvenile court's statements at the hearing makes clear that it decided to terminate father's parental rights because he failed to meet his burden of proving the existence of a parental beneficial relationship exception. We do not believe that the juvenile court injected an improper factor into its determination on the exception or gave information on possible postadoption contact any weight in deciding a permanent plan for Sophie.

Father contends the juvenile court applied an incorrect standard when it stated that father failed to show that he was ready to assume full-time care of Sophie. We agree that whether the parent is or is not ready for the child's return to his or her custody is not, by itself, relevant to the application of the parental beneficial relationship exception. (*Caden, supra,* 11 Cal.5th at p. 638.) However, the comment at issue, viewed in context, appears to have been simply part of the court's summary of the history of the case. It was not part of the basis of the court's decision rejecting the merits of the beneficial relationship exception.

15

In sum, the juvenile court acted within its discretion in rejecting the beneficial parental relationship exception.  Mother, having made no independent contention of error, has likewise failed to show error.

## DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    WILLHITE, J.

We concur:


MANELLA, P. J.


COLLINS, J.