Filed 5/3/23  In re E.C. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re E.C., a Person Coming Under the Juvenile Court Law. | B319257 |
| | (Los Angeles County Super. Ct. Nos. 20CCJP00584 20CCJP00584A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J. C.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Linda S. Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

---

**INTRODUCTION**

Mother J.C. appeals from the juvenile court's order terminating her parental rights over her son, E., following a hearing pursuant to Welfare and Institutions Code section 366.26.[1] She argues that the court considered improper factors and failed to account for the strong bond she had with the child in terminating her parental rights and determining that the parental benefit exception did not apply. We find no error.

The juvenile court also held that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply. Mother contends this holding was predicated upon a defective ICWA inquiry by the Los Angeles County Department of Children and Family Services (DCFS). We agree with mother that DCFS failed to conduct an appropriate inquiry into E.'s possible Native American heritage. We agree with DCFS, however, that the error was harmless. We accordingly affirm.

**BACKGROUND**

**I.    *Referral and Petition***

E. was born in 2019; he lived with mother prior to the proceedings at issue. On January 25, 2020, DCFS received a referral after an altercation between mother and maternal

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

grandmother (grandmother).  Grandmother called law enforcement to report that mother was extremely intoxicated and unable to care for E.  Mother asked grandmother to pick up E., but when grandmother arrived, mother became upset and began punching grandmother in the head as grandmother was holding E. (then 10 months old).  After grandmother got into her car with E., mother began punching the driver's side window, breaking the glass.  Grandmother took E. to a neighbor's house, then returned to try to calm mother down, but the physical altercation continued.  The responding sheriff's deputy told DCFS that mother appeared extremely intoxicated based on her appearance and behavior.  Mother was taken to the hospital for treatment of injuries and then arrested for child endangerment.

According to the sheriff's report from the incident, grandmother stated that mother "is an alcoholic and often places her child in dangerous situations."  Grandmother also reported that mother always became aggressive when she drank and previously assaulted someone while in E.'s presence.  Mother told the responding sheriff's deputy that she punched grandmother "because she is stupid," and "always calls the cops on me."

Grandmother told DCFS that mother was previously arrested in April 2019.  At that time, mother and E. were living with grandmother, and mother and grandmother got into an argument after mother brought E. home while she was intoxicated.  The argument escalated to a physical altercation between mother and grandmother, and mother was arrested.  Since then, mother and E. had been living nearby, and grandmother frequently babysat E.  Grandmother also described an incident in October 2019 when mother arrived intoxicated to pick up E. and then became physically aggressive toward

3

grandmother. After that incident, grandmother obtained a restraining order against mother.

A DCFS children's social worker (CSW) spoke with mother, who stated that she knew E.'s father only as "Al" and had not had contact with him after she learned she was pregnant.[2] Mother stated that following her arrest in April 2019, she completed all her court-ordered programs and her criminal case was subsequently closed. Mother acknowledged relapsing and consuming alcohol in October 2019. She also admitted consuming alcohol the day of the current incident, stating that she drank alcohol while she and E. were guests at a wedding, then drank more alcohol after they returned home. She denied abuse of any other substances. She acknowledged arguing with grandmother but denied punching grandmother or the car window.

DCFS detained E. from mother pursuant to an expedited removal order on January 28, 2020, and placed him with maternal great-grandfather (GGF).

On January 30, 2020, DCFS filed a dependency petition on behalf of E. under section 300, subdivisions (a) and (b)(1).[3] In

---

[2] E.'s father never appeared in the proceedings below and is not a party to this appeal.

[3] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: . . . [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm

4

counts a-1 and b-1, the petition alleged that on January 25, 2020, mother engaged in a violent altercation with grandmother, in which mother repeatedly struck grandmother while grandmother was holding E. and then shattered a window of grandmother's car, while grandmother and E. were inside the car. As a result, mother was arrested for child endangerment and vandalism. The petition also alleged that mother had engaged in a violent altercation with grandmother on a prior occasion. Count b-2 alleged that mother had a history of substance abuse and was a current abuser of alcohol, rendering her incapable of caring for E. The petition alleged that mother was under the influence of alcohol while caring for E. on January 25, 2020 and on prior occasions.

In the Indian Child Inquiry Attachment (ICWA-010(A)), DCFS reported that it questioned mother and she denied any known Indian ancestry for E. At the time of the petition, the identity of father was unknown. In the detention report, DCFS stated that mother denied Indian ancestry in her family and denied any knowledge of such ancestry by father.

Mother completed a Parental Notification of Indian Status form (ICWA-020) for E. on January 31, 2020. She checked the box stating, "I have no Indian ancestry as far as I know."

At the January 31, 2020 detention hearing, the court found a prima facie case for jurisdiction over E. under section 300. Mother told the court she had no way of locating father. The court ordered monitored visitation for mother. The court also found that it had no reason to know E. was an Indian child within the meaning of ICWA.

---

or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child."

## II.	*Adjudication and disposition*

In its jurisdiction/disposition report, DCFS reported that it had been unable to locate father.  DCFS also reported that mother had been arrested in September 2014 for public intoxication after she started yelling and acting aggressively at a fast-food restaurant.

In an interview with DCFS, mother admitted that she "took a couple of shots" on the day of the January 2020 incident and did not remember everything that happened.  However, mother insisted that she would not have hit grandmother while she was holding E.  Mother also stated that she hit the car window with her phone and cracked the glass but did not shatter it, and that E. "was fine" and grandmother should not have called the police.  Mother acknowledged having a problem with alcohol, stating that drinking "makes me a very angry person."

DCFS reported that E. was doing well in the home of GGF and maternal step-great grandmother (GGM), who were providing a "loving, nurturing and safe home environment."  Mother visited E. three times per week and called him daily.  GGM reported that E. enjoyed his visits with mother.  Mother told DCFS that she wanted to reunify with E.; GGF and GGM stated they were willing to adopt E. if mother could not reunify.

Mother enrolled in an outpatient substance abuse program and a parenting program in February 2020.  She was also convicted of criminal charges stemming from the January 2020 incident; her sentence included 52 weeks of domestic violence and parenting programs.  The criminal court also issued a three-year protective order for E. forbidding contact by mother, except for court-ordered visitation.

6

Mother again denied having any Native American heritage when questioned by DCFS in February 2020. She stated that father told her he was from Central America and she had no knowledge of any Native American heritage on his side.

At the adjudication hearing on March 12, 2020, the court sustained counts b-1 and b-2 of the petition and found jurisdiction over E. under section 300, subdivision (b)(1). The court also found a sufficient factual basis for count a-1, but dismissed that count in the interest of justice. The court found by clear and convincing evidence that it was reasonable and necessary to remove E. from his parents and that DCFS made reasonable efforts to prevent removal. The court granted mother monitored visitation three times per week. Mother's court-ordered case plan included parenting and domestic violence programs, individual counseling, a full drug and alcohol program, a 12-step program, and weekly substance testing. The court also made the continued finding that there was no reason to know E. was an Indian child under ICWA.

III.   *Period of Review*

In an August 2020 status review report, DCFS reported that E. had adjusted well to living with his great-grandparents, and appeared comfortable with both GGF and GGM. Mother had not completed any of the court-ordered programs. She was participating in a drug/alcohol program, 12-step program, parenting program, individual counseling, and was seeing a psychiatrist, who had diagnosed her with major depressive disorder and prescribed medication. However, mother had missed multiple sessions of her 12-step meetings and her parenting program. She had not begun a domestic violence program and was not drug or alcohol testing. Mother stated that

she was not testing because of concerns about exposure to the COVID-19 virus. Mother agreed repeatedly to start testing in June, July, and August, 2020, but had not done so. A CSW spoke to an unspecified maternal relative in August 2020, who reported that mother continued to drink alcohol every time they saw each other.

Mother continued to have three visits with E. per week, monitored by GGM. GGM reported that mother was appropriate during visits and would play with E., change his diaper, help him fall asleep for his nap, and feed him. The CSW observed these same interactions between mother and E. and noted that E. seemed comfortable with mother. DCFS opined that E. remained at very high risk of harm if returned to mother, given her history of violent conduct while under the influence of alcohol, her failure to test for substances, her inconsistency in attending her court-ordered programs, and the report that she continued to drink. DCFS therefore recommended terminating mother's reunification services.

In a last-minute information filed October 21, 2020, DCFS reported three negative drug and alcohol tests through mother's substance abuse program in April, May, and September. However, mother's substance abuse counselor told DCFS that mother did not test in June, July, or August and that she could not complete the program because she was inconsistent with testing. The counselor stated that mother did not understand the severity of the consequences for her refusal to test through DCFS. At a meeting on October 1, mother told DCFS that her goal was to begin drug and alcohol testing through DCFS. However, on October 23, mother stated that she planned to wait until after the

8

review hearing to do so.  DCFS continued to recommend termination of mother's services.

At the next review hearing in October 2020, the court found that mother had not made substantial progress toward alleviating or mitigating the circumstances necessitating placement.  Over DCFS's objection, the court continued reunification services for mother.

DCFS reported in March 2021 that E. continued to do well in the care of great-grandparents.  A CSW observed that E. appeared bonded to them, as he "seeks comfort" from GGM and played with GGF. E. was diagnosed with fetal alcohol spectrum disorder based on prenatal alcohol exposure and had "significant speech delays."

Mother continued to participate in a domestic violence program, and she told DCFS that she had learned from her program that the way she spoke to great-grandparents was "aggressive," and that she was the perpetrator and not the victim.  As of March 2021, mother had completed a parenting program and a three-month substance abuse program, the latter of which took her almost one year to complete.  Mother enrolled in an aftercare program following completion of her substance abuse program, but attended only one group meeting.  Mother's substance abuse counselor stated that mother enrolled into an inpatient program in March 2021, which would better assist mother.  Mother told GGF that she was enrolling in an inpatient program because she had "fucked up."

The CSW reminded mother of the importance of testing, which mother stated she understood.  However, mother failed to appear for testing between August 2020 and March 2021, except for a single positive test for marijuana in January 2021.

9

Mother continued to visit E. three times per week, monitored by GGM. GGM reported that mother was appropriate and played with E. and fed him. The CSW observed mother during a virtual visit, noting that E. smiled when he saw mother and smiled and laughed when mother interacted with him. During two in-person visits, the CSW observed mother play with E. and feed him. Mother appropriately redirected E., consistently spoke with the child, and told him how much she loved him. In the status review report, DCFS concluded that it would be detrimental to return E. to mother's care, noting that mother had previously completed a substance abuse program but relapsed shortly afterward. DCFS also noted mother's failure to test and complete her required programs, and her continued lashing out at great-grandparents.

DCFS filed several last-minute information reports between June and August 2021, providing updates to the court but maintaining its recommendation to terminate mother's services. Mother enrolled in an inpatient substance abuse program in March 2021, but left early on May 3, 2021. Mother told DCFS that she left the program because she was harassed by a male patient. A few days later, mother called the CSW and began speaking rapidly, then slowly, and slurred a few words. Mother denied drinking, stating that she was just angry. The same day, the CSW spoke with mother's therapist, who said mother reported to him that she recently drank alcohol.

The program counselor at mother's inpatient program told DCFS that mother was put on "refocus" in the program after having a romantic relationship with a resident in violation of the rules, displaying anger toward staff and residents and responding in an aggressive tone. The counselor stated that

10

mother was "aggressive, impulsive, rude, disrespectful," there was "no getting through to her," she tried to manipulate situations, and did not take accountability for her actions. The counselor stated that she was concerned because mother's mood constantly shifted. Mother asked the counselor only to provide positive information to DCFS and not to report that mother had a positive test for cocaine, THC, and alcohol on March 15, 2021, the day mother had enrolled in the program. Progress letters from the program stated that mother displayed anger toward staff and residents and responded aggressively, and that mother was given several opportunities to address her behavior but "chose to leave treatment" prematurely. The program advised that it was in mother's best interest to reenter a treatment program.

Mother denied that she left the inpatient program because of the rules violations reported by the program. She admitted drinking alcohol prior to the positive drug test but did not recall using any other substances. Mother admitted using Xanax twice in May although it was not prescribed to her, stating, "who cares. I wasn't with my son." Mother had five missed tests and five negative drug and alcohol tests between March and May, 2021.

Mother enrolled in a sober living program in early May 2021 but was discharged on June 25, 2021. Mother's substance abuse counselor reported that mother did not attend many group or 12-step meetings while in the program. She also told DCFS that mother could not reenroll without first completing an inpatient program, due to the number of times mother had enrolled and left the program. Mother also arrived to sessions a few times under the influence of alcohol and was absent from her last two domestic violence program sessions. Mother's therapist during this period stated that she "did okay" in sessions but

11

needed to work on her addiction. He also reported one instance when mother called him while intoxicated.

The manager for mother's sober living house stated that mother had been terminated due to her drinking. Mother had begun to arrive home visibly intoxicated but would pretend she was sober. The manager stated that mother should return to an inpatient program and that she was "not ready to be sober."

Grandmother told DCFS that on May 3, she had received a call from a liquor store employee that mother was drunk and needed to be picked up. On June 11, grandmother reported that mother arrived at her home one night unannounced and intoxicated. Grandmother refused to come out and mother began yelling and calling her a "bitch." When mother refused to leave, grandmother called the police and mother was arrested for violating her domestic violence restraining order. On June 24, mother arrived for a visit with E. carrying a bag containing two cans of alcoholic beverages. Mother claimed they were energy drinks. DCFS noted that mother had been testing clean but it was evident that she continued to drink.

Mother admitted to DCFS that she was intoxicated during an argument she had with grandmother on July 6, 2021. Mother reported that she was not taking her prescribed psychiatric medication because she did not like how it made her feel, and was using marijuana instead. On July 8, grandmother reported that mother had been repeatedly calling and threatening her, stating "I'm going to go to your work and fuck you up!"

Mother enrolled in a new inpatient program in July 2021. On July 22, great-grandparents reported that mother had been inconsistent with visits, cancelling or only attending for an hour or 90 minutes instead of the allotted three hours. GGM reported

that during one visit, mother began to argue while on the phone with grandmother.  GGM also reported that mother was slurring once when she called to speak to E.  Mother failed to attend scheduled substance testing on seven occasions in June and July.

At the review hearing on August 5, 2021, counsel for DCFS argued that mother had done "essentially nothing" and had not addressed her issues.  E.'s counsel joined DCFS's request to terminate mother's services.  Mother's counsel acknowledged mother's continued issues with sobriety but noted that mother was currently in an inpatient program and was asking for more time due to her bond with the child.

The court found mother had been "given an opportunity," but while in her program, "she jeopardized her sobriety and the sobriety of others by coming back to the sober living home repeatedly" under the influence of alcohol, and also noted that mother was not testing on a regular basis.  The court found that continued jurisdiction was necessary, it would be detrimental to E. to return him to mother, and that mother had not made substantial progress toward alleviating or mitigating the circumstances necessitating placement.  The court terminated reunification services for mother, designated adoption as the permanent plan, and set the matter for a permanency planning hearing.

## IV.    *Termination of Parental Rights*

DCFS filed a section 366.26 report in November 2021. DCFS reported that E. was happy, active, and developing well emotionally and cognitively.  Great-grandparents were caring for E. well and were committed to adopting him.

Mother filed a section 388 request to change court order (form JV-180) on December 8, 2021.  She requested that the court

13

reinstate her reunification services and grant her unmonitored visits. She stated that she had completed a full drug and alcohol program, a 52-week parenting program, a 52-week domestic violence program, anger management classes, and individual therapy. Mother further stated that the requested change would benefit E. because he was bonded to mother, and reunification services would allow the court to "monitor mother's sobriety and stability." She attached certificates of completion for parenting, domestic violence, and anger management programs, and a certificate for completion of 43 days of residential treatment, all dated August 2021.

The court set mother's section 388 petition for a hearing in February 2022. In a January 2022 status review report, DCFS noted that the case had recently been reassigned to a new CSW because the prior CSW had been on leave since December 2021. E. continued to do well with great-grandparents and to have monitored visits with mother. DCFS reported that great-grandparents provided a nurturing and loving home and that E. appeared well-bonded to them. E. referred to his great-grandparents as "mom" and "dad." DCFS also noted that E. was "exhibiting oppositional behaviors," and referred him to mental health services.

In October 2021, the prior CSW reported that during an earlier visit, mother raised her voice at E. for spilling a drink. The CSW also reported prior occasions where mother called E. a "chicken" several times when E. was scared and called E. a "motherfucker" while playing with him. On January 31, 2022, GGM stated she could not confirm these reports. GGM denied witnessing any further concerning interactions or any behavior that would suggest mother was under the influence.

14

The court continued the hearing to March, to enable DCFS to file a full response to the section 388 petition. In a February 2022 review report, the CSW observed that E. was playful but had difficulty following directions. Mother told DCFS that she understood she had made mistakes but was ready to regain custody. She stated she had been consistently visiting E., completed all required programs, remained sober, maintained employment, and had her own apartment. Mother also reported that she had reconciled with grandmother and they were now on good terms. On February 9, mother agreed to an on-demand drug test, but stated that she could not do it that day. She agreed to test the following day, but then missed the appointment. Mother ultimately submitted a negative test on February 14. Mother also told DCFS that she was living with her boyfriend. However, when DCFS asked for a background check, she stated that her boyfriend did not live with her. Mother's boyfriend declined to provide his identifying information to allow DCFS to assess him as a potential caregiver.

When asked his opinion of mother having additional reunification services, GGF said he did not think E. would be safe with mother and that as far as he knew, mother had not completed any services to address her drinking and violent conduct. He stated that mother was usually calm but would become angry for no reason. GGM said she did not think mother was emotionally stable enough to care for E. She agreed with GGF that mother would be calm but then suddenly become angry and verbally aggressive, including toward E. and sometimes used foul language toward E. GGM stated they no longer held the visits in their home due to mother's aggressive behavior. However, she reported that mother's visits were consistent and

15

that E. enjoyed the visits and became sad when the visits ended. GGM stated that E. appeared to understand that he was not in mother's care and he missed her.

DCFS opined that it was evident that mother maintained a bond with E. and that she had completed her programs, but she had not demonstrated she could provide a safe and permanent home for the child. DCFS noted the report of mother yelling and cursing at E. in October, despite completing programs a few months prior. DCFS also noted its concern with mother missing tests and not being forthcoming about her new relationship.

In a last-minute information filed February 23, 2022, DCFS reported that on February 22, mother contacted DCFS and asked whether the prior CSW, who had returned from leave, could be reassigned to her case. The CSW stated that mother "became repetitive and sounded different" than the last time they had spoken, so the CSW asked whether mother was working that day and mother said she was not. When the CSW asked mother to submit to an on-demand drug test, mother said she was being called to work that afternoon, so she would not be available to test. However, mother then stated she would test because she would do anything to have E. returned to her. The CSW also received a call from grandmother, who said she was reluctant to provide a statement for fear of retaliation from mother, but that she did not feel E. would be safe in mother's care. Grandmother stated that mother was constantly contacting her and threatening her at her job.

DCFS requested that the court deny mother's section 388 petition, opining that mother had not reconciled with grandmother, as mother had reported, and that mother's

16

continued violent conduct placed E. at "very high" risk of further physical and emotional harm.

At the March 2, 2022 permanency planning hearing, mother's counsel informed the court that mother had reenrolled in an outpatient substance abuse program, as "there was a recent relapse." However, he argued that mother had demonstrated a change in circumstances because she completed her case plan, was honest about the relapse, and "immediately" reenrolled in a program. He also pointed to the bond between mother and E. and her consistent visits. He therefore asked the court to give mother "one more chance" with six more months of reunification services.

Counsel for E. asked the court to deny the petition, arguing that the majority of E.'s life had been spent with his great-grandparents as his caregivers and that it would be in E.'s best interest to deny the petition. Counsel for DCFS also asked the court to deny the petition, noting that mother had made some positive changes, but her ongoing substance abuse had not changed. He also argued that mother's visitation, although consistent, had not "necessarily established a bond to the extent that it would justify a finding of best interest."

Regarding mother's section 388 petition, the court found that mother had demonstrated a change in circumstances because, following her relapse, she "ensured that E[.] was safe and reenrolled in a program. Turning to the assessment of E.'s best interests, the court noted that E. had spent most of his life out of mother's care. The court cited evidence that E. "seems to miss the mother and is sad after the visits, but that's all the information that's in the record." The court also stated it was considering mother's history in complying with programs and

17

then relapsing, including at least three "significant" relapses during the nearly three years of E.'s life. Based on those circumstances, the court denied mother's petition, finding that mother had not met her burden to show that it would be in E.'s best interest to grant six more months of services.

During the permanency planning portion of the hearing, mother testified that E. called her "mommy N[.]" (mother's middle name), called GGM "mama," and GGF "papa." Mother testified that she visited E. three times a week for three to four hours and called him every day. The visits took place at the park, and she and E. would color, play soccer, run around, go on the slide, and sometime eat together. When E. saw mother at the start of the visits, he would come over and give her a kiss; when the visits were over, E. would ask why she was leaving, become sad, and cry. Mother also testified that recently, E. would ask her to come home with him. Mother denied ever being intoxicated during a visit and denied ever getting upset with E., swearing at him, or being aggressive during a visit. She acknowledged that the visits took place in the park because she and GGF "don't always see eye to eye." .

The court asked mother, "do you believe that you would be able to continue to be part of E.'s life if he gets adopted?" Her counsel objected, citing *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). The court overruled the objection, finding that the question "goes to the emotional attachment and the parental relationship and what effect it would be like for the child without the parent in [his] life." Mother responded that she would "maybe" be involved, "to an extent. But I don't think as much as he needs me, no."

18

Counsel for DCFS argued that the evidence that E. and mother enjoyed their visits was insufficient to overcome the benefit he would receive from permanency. He also cited the evidence from GGM regarding the issues during visits with mother losing her temper and yelling at E. Counsel for E. also urged the court to find that the parental benefit exception did not apply. Mother's counsel argued that she had met the factors under *Caden C.* for the parental benefit exception. He also contended that under *Caden C.* the court must "assume that there will no longer be contact" between mother and E. if her rights were terminated.

In making its findings, the court expressly acknowledged the *Caden C.* test,[4] explaining that "I'm not looking at the specific bond in terms of the role the parent played. I'm not looking at mother's participation or her accomplishment or compliance with any of the court-ordered case plans. What I'm looking at is realistically the relationship with mother and E[.]" The court found that mother had met the first element of consistent visitation with E. Regarding E.'s emotional attachment to mother (the second element), the court noted that E. lived with mother for 10 months and with great-grandparents for 26 months, and found that E.'s time with and removal from mother was "a somewhat traumatic time because of the mother's use of

_____

[4] As discussed further below, *Caden C.* set forth three elements a parent must show to establish the parental benefit exception to termination of parental rights: (1) regular visitation with the child; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

19

substances and the difficulties that [she] was experiencing." The court also noted that E. called mother "mommy" and GGM "mama" and did not find that these names necessarily suggested how E. felt about one caregiver versus the other. Nevertheless, based on the evidence that E. enjoyed his visits with mother, the court moved on to the third element.

The court next stated that it was assessing the impact to E. if he were to lose his relationship with mother, reasoning that "it's not certain" that mother could continue to have a relationship with E. after adoption. With respect to the evidence of mother's negative conduct during visits, the court noted that mother denied such conduct, and also that there was no evidence that "mother's behavior overwhelmed the visits, in the sense that she consistently would yell or say inappropriate things." The court stated that it was weighing "whether or not there is a substantial positive emotional attachment," and whether "considering the benefits of a new adoptive home, would E[.] be harmed such that I should not terminate parental rights today." The court concluded it could not make a finding of such harm, explaining that "despite the consistent visits, despite the interaction, I don't believe that there has been evidence today that the relationship that exists between the mother and E[.] flows from E[.] to the mother in the same way that it flows from the mother to E[.] . . . I think that the mother has a much stronger sense of the relationship and bond." The court acknowledged that it could not "look at the struggles that led to dependency," but found that those issues "could be probative as to whether or not the interaction between the mom and E[.] has some kind of a negative effect on E[.] And I think the mother's ongoing struggles and her relapses and the history of entering a

20

program, leaving a program, starting another program and not being consistently stable have had an impact and do continue to have an impact," including as a basis for "some of the frustration and anger" E. experienced. The court concluded that terminating parental rights was "the appropriate decision today for E[.] because he is adoptable," and because "the relationship that exists now does not seem to be one with such a strong emotional attachment that without it E[.] would be harmed." The court thus found that the parental benefit exception did not apply, that E. was adoptable, and terminated mother's parental rights.

Mother timely appealed from the court's order.

## DISCUSSION

### I. *Termination of Parental Rights*

Mother contends the court erred in finding that the parental benefit exception to adoption did not apply and thereby terminating her parental rights pursuant to section 366.26. We find the court did not abuse its discretion in concluding that mother had not established the necessary exception.

### A. *Legal Principles*

#### 1. **Parental benefit exception**

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1); see also *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'"]) Thus, once the juvenile court finds the child is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can

21

establish one of the exceptions set forth in section 366.26, subdivision (c).  (*In re Celine R., supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1); *Caden C., supra*, 11 Cal.5th at p. 625.)

The specified circumstances in section 366.26, subdivision (c)(1)(B) are "exceptions to the general rule that the court must choose adoption where possible."  (*In re Celine R., supra*, 31 Cal.4th at p. 53.)  "At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.'  [Citation.]  The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption."  (*Ibid.*; see also *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental benefit exception, which permits the selection of another permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  In *Caden C., supra*, 11 Cal.5th at p. 631, our Supreme Court "discern[ed] three elements the parent must prove" to establish the parental benefit exception under section 366.26, subdivision (c)(1)(B)(i).

First, the parent asserting the exception must show "regular visitation and contact with the child, taking into account the extent of visitation permitted."  (*Caden C., supra*, 11 Cal.5th at p. 636.)  This element is "straightforward," involving an assessment of whether the parent visits consistently.  (*Id.* at p. 632.)

Second, the parent must show that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from

22

continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) In assessing whether the child would benefit from continuing the relationship with the parent, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id*. at p. 632.) Thus, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

For the third element, the parent must show that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id*. at p. 633.) This evaluation consists of a "subtle, case-specific inquiry[,]" including consideration of whether "the benefit of placement in a new, adoptive home" outweighs the harm the child "would experience from the loss of [a] significant, positive, emotional relationship" with the parent. (*Ibid*.) In making this detriment determination, the juvenile court does "not look to whether the parent can provide a home for the child," and "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.)

23

## 2.     Standard of review

In *Caden C., supra*, 11 Cal.5th 614, our Supreme Court clarified the standard of review applicable to a juvenile court's findings regarding the parental-benefit exception.  The first two elements—regular visitation and a beneficial relationship—involve determinations that are essentially factual; we therefore review those findings for substantial evidence.  (*Id*. at p. 640.)  The third element requires the juvenile court to determine whether any harm the child would suffer from the severance of the parental bond would outweigh the benefit to the child of adoption.  (*Ibid*.)  This requires a "hybrid" standard of review.  (*Id*. at pp. 640-641.)  Like the first two elements, the juvenile court must make a series of factual determinations including determinations about the child's relationship with a parent, which we review for substantial evidence.  (*Id*. at p. 640.)  However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion."  (*Ibid*.)

We also note that, unlike in *Caden C.*, the juvenile court here found that mother did not meet her burden of proving the exception.  In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case

24

[citations]." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.)  Thus, to the extent mother challenges the juvenile court's findings regarding her failure of proof, we determine whether the evidence compels a finding in mother's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding.  (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.)

### B.     *Analysis*

Given the juvenile court's express finding that mother met the first element under *Caden C.* and implied finding that she also met the second element, both parties focus their arguments on the third element—whether the benefits of adoption would outweigh the loss of E.'s relationship with mother.  Mother first contends that the court improperly considered the possibility of a continued relationship between mother and E. after termination of mother's parental rights.  Mother is correct that for purposes of the parental benefit exception, the court "must assume that terminating parental rights terminates the relationship." (*Caden C., supra*, 11 Cal.5th at p. 633.)  Mother points to the court's question during her testimony regarding whether she thought she might be able to have a continued relationship with E., and the subsequent overruling of mother's counsel's objection to that question.  Although the court allowed mother to give testimony in response to its question, we disagree with mother that the court improperly relied on the possibility of a future relationship with E.  In analyzing the third element, the court specifically stated that it was assessing the impact to E. if he were to lose his

25

relationship with mother.  Thus, the record reflects that the court properly assessed the loss of their relationship if E. were adopted.

Mother next argues that the court improperly considered her continued struggles with sobriety as a factor against applying the exception.  Under *Caden C.*, a court may not rely solely on "[a] parent's continued struggles with the issues leading to dependency" (*Caden C., supra*, 11 Cal.5th at p. 637) such as substance abuse, or "look to whether the parent can provide a home for the child." (*Id.* at p. 634.)  However, a parent's struggles may be relevant to the extent they impact the relationship with the child, as, for example, "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a "'negative" effect' on the child." (*Id.* at p. 637.)  Here, the juvenile court properly applied *Caden C.*, noting that it could not look to mother's relapses, taken alone, as a bar to the exception, but it could consider how her history of enrolling in programs, then dropping out and relapsing affected her relationship with E. Indeed, the court noted that some of E.'s behavioral issues might be tied to the disruption and instability flowing from mother's conduct.  The court was entitled to consider this evidence as a factor relevant to whether it would be detrimental to E. to terminate his relationship with mother.

We are not persuaded by mother's argument that this case is similar to *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*).  In *S.B.*, father was the primary caregiver for daughter S.B. until his arrest on drug-related charges when S.B. was three years old. (*Id.* at p. 293.)  Although father fully complied with his case plan, including consistently visiting S.B. and maintaining his sobriety, his physical and emotional health issues prevented him from reunifying with the child. (*Ibid.*)  Indeed, the case social worker

remarked that "'It pains the Agency not to be able to reunify [father] and his daughter because of his consistent efforts to alleviate and or mitigate the reasons his family was brought to the attention of the court.'" (*Id*. at p. 294.) In reports prepared for the section 366.26 hearing, social workers observed during several visits that S.B. (then five years old) had a "consistent and positive relationship with the father," including sitting in his lap, playing with him, telling him that she loved him, and stating that she wished she lived with him. (*Id*. at p. 295.) However, the social workers concluded that S.B.'s primary parental relationship was with her grandmother, and therefore opined that "the loss of the parent-child relationship would not be a 'huge detriment' to S.B." (*Ibid*.) The juvenile court agreed and declined to apply the parental benefit exception. (*Ibid*.)

The appellate court reversed, rejecting the argument that the parental benefit exception required a finding that the child had a "primary attachment" to the parent. (*S.B., supra*, 164 Cal.App.4th at p. 299.) The court also found error in the juvenile court's finding that "any detriment to S.B. from the loss of the parent-child relationship will eventually be ameliorated by time and S.B.'s strong relationship with her grandmother." (*Ibid*.) Based on the record, the court concluded that "the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with" the father. (*Id*. at p. 301.)

Here, by contrast, E. was only 10 months old when he was removed from mother, and subsequently lived with great-grandparents for the next 26 months. Given his age, his ability to express his feelings regarding his relationship with mother was limited. As noted above, the court was also entitled to

27

consider the effect that mother's relapses and associated conduct had on her relationship with E. Moreover, although the court found that E. enjoyed mother's visits, it also concluded that his attachment to mother was not as strong as mother's attachment to him, and therefore that this bond did not outweigh the benefits of adoption. Mother has not demonstrated that this was error.

We also reject mother's contention that it is "not apparent" that the juvenile court correctly applied the standards under *Caden C.* in analyzing the parental benefit exception. Mother's counsel extensively relied on *Caden C.* in his argument regarding the exception and the court properly recognized its role in conducting a "complex" and case-specific inquiry into the *Caden C.* factors. Moreover, the court expressly considered and distinguished the facts in *Caden C.* and a subsequent case, *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*), finding that the facts in mother's case did not establish the exception. Thus, mother's reliance on *D.M.* is unavailing, as the juvenile court in that case expressly "considered factors which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies." (*D.M.*, *supra*, 71 Cal.App.5th at p. 271.)

Additionally, we disagree with mother's contention that this case is analogous to *D.M.* with respect to the quality of the reports by DCFS. In *D.M.*, at the time of the section 366.26 hearing, the youngest of the three children was at least five years old, the oldest was 12 or 13. (*D.M.*, *supra*, 71 Cal.App.5th at pp. 264, 267.) In reversing the termination of parental rights, the court found that the juvenile court had failed to properly assess the emotional attachment between the father and his children. The appellate court also noted that the social workers' reports did not adequately address this factor, as they "gave the court little

28

evidence about the quality of the visits between father and the children, or how the children felt about father.  The children were rarely, if ever, asked how they felt about father or whether they enjoyed visits with him." (*Id*. at p. 270.)  Indeed, the last status review report prior to the hearing "did not contain an update about father's visitation and stated further information about his visitation would be provided by last minute information"; no further report was ever filed.  (*Id*. at p. 267.)  Here, unlike in *D.M.*, DCFS provided numerous reports with information from E.'s caregivers as well as observations from the CSWs about the frequency and quality of mother's visitation.  DCFS also recounted the limited statements made by E., including that he called mother "mommy," but was unable to provide meaningful interviews with E. about his feelings due to his age and limited speech.

As such, we find no abuse of discretion by the juvenile court in concluding that mother failed to satisfy the parental benefit exception.

## II. *ICWA Inquiry*

Mother argues that the court's finding that ICWA did not apply is invalid due to DCFS's failure to discharge its duty of inquiry into E.'s possible Native American heritage.  DCFS responds that any inquiry error was harmless, as mother makes no affirmative representation of Native American heritage on appeal.

### A. *Requirements*

Under ICWA, state courts must ask each participant in a child custody proceeding "'whether the participant knows or has reason to know that the child is an Indian child.' [Citation.]  The court must also 'instruct the parties to inform the court if they

29

subsequently receive information that provides reason to know the child is an Indian child.'" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 551; see also 25 C.F.R. § 23.107(a).) Additionally, state law "more broadly imposes on social services agencies and juvenile courts (but not parents) an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742; see also § 224.2, subd. (a); *In re Y.W., supra*, 70 Cal.App.5th at p. 551.)

The duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) If the inquiry gives DCFS a "reason to know" the child is an Indian child, then the formal notice requirements set forth in section 224.3 apply. (§§ 224.2, subd. (d), 224.3, subd. (a).) Alternatively, the juvenile court may find that a child is not an Indian child if the agency's "proper and adequate" inquiry and due diligence reveals no "reason to know" the child is an Indian child. (§ 224.2, subd. (i)(2); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1050.)

"We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; see also *In re D.S., supra*, 46 Cal.App.5th at p. 1051; § 224.2, subd. (i)(2).) If an inquiry is inadequate, we "must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*In re Dezi. C.* (2022) 79 Cal.App.5th 769, 777, review granted Sept. 21, 2022, S275578 (*Dezi C.*).) "If so, the

error is harmless and we should affirm; otherwise, we must send it back for the Department to conduct a more comprehensive inquiry." (*Id.* at p. 777.)

**B.** *Analysis*

The record in this case supports mother's contention that DCFS failed in its duty of inquiry. Aside from asking mother about her Native American heritage at the outset of the case, DCFS did not ask any of the several maternal relatives with whom it interacted whether E. might have Native American heritage. None of the reports or other filings give any indication that DCFS broached the topic with anyone other than mother, despite, for example, extensive contact with maternal grandmother and E.'s great-grandparents, who were the designated adoptive parents and were forthcoming with information throughout the proceedings.

DCFS concedes that the "record does not reflect that any relatives other than mother were asked about ICWA." Accordingly, we must determine whether this error was harmless; "in other words, we must assess whether it is reasonably probable that the juvenile court would have made the same ICWA finding had the inquiry been done properly." (*Dezi C., supra*, 79 Cal.App.5th at p. 777.) The courts of appeal have devised at least four different analytical frameworks with which to assess whether a violation of ICWA's initial duty of inquiry is harmless. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 435 [concluding that "the error is in most cases . . . prejudicial and reversible"]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069-1071 [finding harmless error unless the parent makes a good-faith claim of Native American ancestry on appeal]; *In re Benjamin M., supra*, 70 Cal.App.5th at p. 744 [reversing where

"there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child"]; *Dezi C., supra*, 70 Cal.App.5th at p. 779 [finding harmless error "unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding"].)

For the reasons articulated in *Dezi C., supra*, we conclude the "reason to believe" test is the most appropriate approach. (See *Dezi C., supra*, 79 Cal.App.5th at pp. 779-785.) Under this approach, "a reviewing court would have 'reason to believe' further inquiry might lead to a different result if the record indicates that someone reported possible American Indian heritage and the agency never followed up on that information; if the record indicates that the agency never inquired into one of the two parents' heritage at all [citation], or if the record indicates that one or both of the parents is adopted and hence their self-reporting of 'no heritage' may not be fully informed [citation]." (*Id.* at p. 779.) For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Ibid.*)

The record here provides no "reason to believe" E. is an Indian child. Mother repeatedly informed DCFS she had no Native American heritage and never provided any updated information throughout the proceedings. Nothing elsewhere in the record or appellate briefing suggests otherwise. There is also no indication in the record that the self-reporting from mother was not fully informed. As to father, mother had no contact information for him or any of his family members, and DCFS's efforts to locate him throughout the case were unsuccessful.

Under the *Dezi C.* framework and the circumstances presented here, the inadequate ICWA inquiry is harmless.

## DISPOSITION

The order terminating mother's parental rights is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:



CURREY, ACTING, P.J.



ZUKIN, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.